LILLIE E. THOMAS et al., Respondents, v. SARAH M. ENGLISH et al., Appellants.

Kansas City Court of Appeals, May 18, 1914.

1. **WILLS: Testamentary Capacity: Morphine and Whiskey.** A testator was shown to be 72 years of age and that he used whiskey and morphine to excess at times, on account of the pain of rheumatism. That he was irritable and very deaf. That he quit his former associates to a large degree and occasionally muttered to himself. That he did not always answer in response to the conversation directed to him. That he surrendered the management of his business to his daughter and bequeathed to the latter and his widow the greater portion of his estate, is not sufficient evidence of testamentary incapacity to submit to a jury.

2. ———: **Mental Capacity: Measurement.** There is no instrument for the measurement of mental capacity, and each case must be decided by its own peculiar facts guided by the law.

3. ———: ———: **Business Ability: Test.** Competency to make a will may exist where ability to conduct business may be lacking.   The test of testamentary capacity is, did the testator know what he was doing and to whom he was giving his property?   Did he understand the act he was performing?

4. ———: ———: ———: **Witnesses: Attestation.** A testator had written his will with his own hand and a member of his family, with his knowledge, had sent for two witnesses to come to his residence to attest it. When they arrived, he came into the room, sat down and signed the will in their presence and they attested it in his presence and the presence of each other.

Appeal from Jackson Circuit Court.—*Hon. Jas. H. Slover,* Judge.

REVERSED AND REMANDED (*with directions*).

*Johnson & Lucas* for appellants.

*J. C. Hargus* and *Fyke & Snider* for respondents.

ELLISON, P. J.—This action was instituted by plaintiffs to contest the validity of the last will of Joseph L. English, deceased. The contestants were successful in the trial court.

Plaintiffs are the testator's children by a former wife. The defendants are his last wife and their daughter Maude. The plaintiffs are married and did not live with the testator. Maude had married against the will of her parents, but had become separated from her husband and had returned to her father and mother before the former's death. She assisted in managing the affairs of the family and figures largely in this controversy.

The testator resided in Kansas City, Missouri, and the will now attacked was made in that city in September, 1905, which was nearly three years before he died. He had formerly lived in Osceola, Missouri, and while residing there in 1900 had made a will in many respects like the one in controversy. Each of these wills was written by the testator with his own hand. The one in controversy bore, on its face, not the slightest evidence of incapacity. On the contrary, uninfluenced by matters *aliunde,* it would be accepted anywhere as the act

of a plain business man disposing of his property without the assistance or suggestion of others. Both wills indicate a desire to provide chiefly for the widow, who was seventy-two years of age at his death. He left to Lillie, one of these contestants, a note which he held against her and her husband for $1095.82, and all interest. He also gave to her the sum of three hundred dollars which he had theretofore advanced. To his son Alonzo, the other contestant, he left eleven hundred dollars in cash, to be paid by his widow if it met her approval. He gave to his daughter Maude eleven hundred dollars in cash, to be paid by his widow. The real estate was left to his widow. The remainder of his personal estate was also left to her, but at her death was to go to Maude. The widow was made executrix to act without bond.

The grounds of contest were lack of testamentary capacity and undue influence of defendants. The latter ground failed of proof and the trial court sustained a demurrer to the evidence, leaving the case standing for decision on the former. The evidence bearing on that ground, as brought out by the contestants, was that deceased was seventy-two years old when he made the will; and that he was feeble and for several years prior to its execution had been a habitual user of morphine and whiskey in large quantities. That there was no cause for estrangement between him and the plaintiffs. That for fifteen years before his death he ceased to attend to business except to collect some rents on property in the town of Osceolo. That after Maude was divorced and returned to live with her parents, she took charge of his business affairs, he even permitting her to buy for him a piece of property in Kansas City (directing the deed made to his wife), and to sell a dwelling house in Osceola for one thousand dollars, and that he conveyed to her a business house in that town. The evidence bearing directly on his mental status consisted chiefly in the way he acted with for-

mer acquaintenances and with those with whom he would be casually thrown in contact. That he would sit alone and that when attempts were made to engage him in conversation he would answer in a way that was not responsive to what had been said. Specific instances were given: One where he was working with a lawn mower and a neighbor asked him a question when he only looked up and made no response and went on with his work. That he was heard "muttering," while walking along the street.

There was evidence tending to show that he was frequently under the influence of whiskey and morphine; and it is that habit which has been kept prominently forward by contestants as showing the cause for mental incapacity and leading to his eccentric actions in the treatment of acquaintenances, and of his surrendering the conduct of his business to his daughter Maude.

When that part of the evidence for contestants, which is practically undisputed, is considered, in connection with that of defendants, as it must be, we find matters which, alone, might be said to sustain the attack upon the testator's mental capacity, are explained in a way which leaves his conduct quite normal and natural. That he was seventy-two years of age, standing alone, counts for nothing; nor does the fact that he was heard at times muttering or talking to himself. That is a habit not confined to mental imbecility. So his exhibitions of temper are of no moment, since that is a misfortune forming a part of the fraility of humanity. But it would be unfair to contestants to separate each causal fact in support of their complaint and find that it, alone, was insufficient. They are entitled to have all considered as making out the one charge of mental incapacity.

It seems to us that every charge made is met by such complete explanation as strips it of probative force. That Maude attended principally to his busi-

ness, resulted from the misfortune of deafness. He was not totally bereft of hearing, but so nearly so that it was almost impossible to make him understand—some persons could not succeed at all. This made it proper and necessary that someone relieve him and others of such disagreeable burden. This accounted for his being unsociable; and of his not answering in a responsive way to conversation addressed to him; and of his sitting to himself. This is common observation and knowledge.

Concerning the habit of whiskey and morphine—it was not pretended that he was ever a drunkard. It was shown that he never went about drinking places, but that he took a "dram" at home. That as he grew older he was afflicted with rheumatism in the ankles and toes so that the pain was frequently nearly unbearable. He therefore felt compelled to take morphine at times. It was admitted that frequently in such periods he was irritable and disagreeable to an annoying degree. A letter of Maude's to John Thomas, the husband of one of the contestants, was read in evidence by contestants, and it does show an admission that her father "had been full of morphine and whiskey, and mad as the devil all day," and that "He has gotten almost past living with and curses everybody on the place." The temper of the letter is bad and the writer was evidently ashamed of it, as was shown by her hesitation and embarrassment in admitting she wrote it. But, unfortunately for contestants, as an entire paper it tends to show ample testamentary capacity. It shows he had written a letter to the same person (subject not disclosed) and that he also was discussing the purchase of a ranch that one of contestants had written about and of removal thereto; and the reason for his wrath on that occasion was that she had presumed to suggest to him that he "was drinking entirely too much."

We need not go into a detailed statement of the evidence showing the old gentleman to be a man of intellectual force and not subject to undue influence; the latter phase of the case, as we have already said, being abandoned at the trial. Several acquaintances and friends at Osceola had visited the family after removal to Kansas City and testified to his mental strength.

As was said in Crum v. Crum, 231 Mo. 626, 638, there is no instrument for the measurement of mental capacity, and we must decide each case upon the facts under the rules of law. Applying the law to the showing made by plaintiffs, we find it does not in any way support the judgment. [Gibony v. Foster, 230 Mo. 106; Winn v. Grier, 217 Mo. 420; Conner v. Skaggs, 213 Mo. 334; Archambault v. Blanchard, 198 Mo. 384; Hughes v. Rader, 183 Mo. 630.] In the case first cited, the following is the substance of what was held to be insufficient to make a case of incompetency: The testatrix was eighty-eight years old, her sight was bad and sometimes while on the street she inquired the way to her home; at times she did not recognize old or new acquaintances and once her granddaughter, and her talk was often rambling; in the will she gave a farm to a son and located it in Green county when it was but seven miles away in Polk county, and stated therein that the son was residing on it, when in fact he was then in Indian territory; she was old and infirm and real estate agents at different times had succeeded in making bad bargains with her. Witnesses testified at times she seemed to know pretty well what she was doing, but at other times she didn't know anything; that she was absent minded caused by impaired health and old age. Testatrix had told a number of witnesses that she didn't have sense enough, or mind enough to manage her own business. Witnesses testified that one of the proponents had stated that testatrix, her mother, was just like a child, that her mind was just like a

child's. Another witness stated that "the fact is that anybody knows that Mrs. Giboney's mind was as weak as a five-year old child's; anybody who knew her any length of time in 1902 knew she had no mind."

In Winn v. Grier, 217 Mo. 420, in the syllabus containing a synopsis of the case, it is said that: "The manifestation of numerous eccentricities by the aged testator prior to the execution of his will does not of itself show incapacity. So that where testator used excessive amounts of a patent kidney medicine and recommended it to his friends for all kinds of diseases; manifested a hitherto unknown desire to make political speeches, and was positive in his utterances that certain candidates should not be permitted to run for office, and that Bryan was not honest and McKinley was not fit to be president, and that he could make a better president than McKinley; got up at night and sang Psalms; took his dogs and went hunting at night; though he got no game, and had not in former years been known to hunt; exhibited his stallion and other stock at church meetings, failed to recognize acquaintances, carried on disconnected conversations, had a roaring in his head, used coal oil in his ears, and poured coal oil on trees and when it killed them said he had no sense—neither these eccentricities nor other peculiarities like them show a want of capacity to make a will, and opinions predicated upon them that he was incapacitated give no additional force to those facts, nor do they tend to establish incapacity."

Competency to make a will may exist where ability to conduct business may be lacking. The question is, "did the testator know what he was doing and to whom he was giving his property?" [Sehr v. Lindemann, 153 Mo. 276, 288.] In that case it was said: "By competency is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it and the persons or objects he makes the beneficiaries of his bounty.

Imperfect memory caused by sickness or old age, forgetfulness of the names of persons he has known, idle questions or requiring a repetition of information, will not be sufficient to establish incompetency if he has sufficient intelligence remaining to fulfill the above definition.''

Tested by these examples and the rules applied to them, we must hold plaintiffs failed to make a case on the evidence.

We find no ground to support the point made that the will was not properly attested. The witnesses were called to the house for that purpose. The testator, as already stated, had written the will himself, and when the witnesses came he came into the room and knew the object of their coming, and signed the will in their presence, and they in turn signed the attestation in his presence and the presence of each other. It is true that no words passed between them and the testator, but this was not requisite and in the condition of his hearing was not unnatural. [Hughes v. Rader, 183 Mo. 630; Martin v. Bowdern, 158 Mo. 379; Lindsey v. Stephens, 229 Mo. 600.]

The judgment is reversed and the cause remanded with directions that the instrument be declared to be the last will and testament of Joseph L. English, deceased. All concur.