MARY ALICE HEINBACH v. JESSE HEINBACH
et al.; EDITH BRITTEN and NAOMI SUMMERS,
Appellants.

Division Two, April 26, 1918.

1. **UNDUE INFLUENCE: Marriage for Money.** Testimony tending
to show that plaintiff married the filthy old testator for his money
is not sufficient to set aside his will on account of her undue in-
fluence, nor to submit that issue to the jury, where the evidence
further shows that she discharged the duties of a good wife, that
his appearance and drunken habits were much improved by the
marriage, that he entertained a true affection for her, and there
is no evidence, direct or circumstantial, that she did or said any-
thing which had a tendency unduly to influence him in making
the disposition of the property he did.

2. **TESTAMENTARY CAPACITY: Evidence: Decree of Divorce.** In a
suit to have a will sustained, brought by a second wife against
testator's children by a former wife, the decree of divorce obtained
by him from said former wife is competent as tending to explain
the relations he sustained to them, and to throw light on the reason-
ableness or unreasonableness of his bequests and thereby his
mental capacity.

3. ———: ———: **Leases.** Certificates of acknowledgments of leases
made by testator prior to his death are admissible in evidence in
the will contest, for purposes of showing that they were executed;
for the leases themselves would prove nothing as to testator's
capacity to transact business unless it was shown that he executed
them. But it is proper to instruct the jury, upon request, that the
certificates are admissible only for the purpose of showing the
execution of the leases.

4. ———: ———: **Opinions.** Witnesses who had no talk with testator
and did not hear him talk under such circumstances as would
make them competent to judge whether he was mentally sound
or unsound should not be permitted to give their opinions of
testator's sanity.

5. ———: ———: **Conclusions.** Witnesses should not be permitted
to give their conclusions as to testator's mental state, such as
"he never talked like he had much sense to his talk," "it would
be just drunk talk," etc. Nor should they be permitted to answer
questions about testator's hallucinations and imaginings, but should
be required to state the facts as to what he said and did.

6. ——: ——: **Opinion: Qualification of Witness.** Witnesses who had or who witnessed business dealings with the testator, especially if such dealings extended over a series of years, are qualified to give their opinion as to his sanity.

7. ——: ——: **General Objection.** Unless the objections to the testimony of a witness state the specific grounds thereof they will not be reviewed on appeal. An objection that the question "is not proper" or "is irrelevant" or "has no bearing on the case" or "is an improper method of showing mental condition" is not sufficient.

8. ——: ——: **Conclusion of Non-Expert: Facts Incapable of Complete Statement.** *Held*, by WHITE, C., that whether or not the opinion of a non-expert witness may be received at all depends upon the nature of the facts from which it is drawn. Such a witness may give his conclusions or deductions when the matter is one which a witness of ordinary intelligence can understand, and such conclusions or deductions are based upon facts which are incapable of being properly or accurately described by him to the jury. If he can clearly and accurately give the facts upon which he might base his conclusion, then it is for the jury to draw the conclusion, and the opinion or deduction of the witness is improper. In any event, he must qualify and show he knows the facts from which he draws his conclusion, and must state them as far as he can; but if they are not susceptible of complete and accurate portrayal before the jury, he may state his conclusion.

*Held*, by FARIS, J., with whom the other judges concur, that to permit a non-expert witness to state his conclusion as to the ultimate fact to be found is an invasion of the province of the jury, and is allowable only as to the issue of insanity, and even then it is for the jury to say whether the quantum of insanity is sufficient to destroy testator's testamentary capacity.

9. ——: ——: ——: ——: **Witness to Will: Comprehension of Property and Heirs.** *Held*, by WHITE, C., that a witness to a will who had known the testator for three years and had seen him every day and sometimes twice a day was qualified to testify that the testator, at the time the will was read to him, in the presence of two witnesses, comprehended and had sufficient mind to comprehend who his children were and had sufficient mind to understand the nature and extent of his property and to whom he desired to give it, the will itself mentioning all the children, and giving to them nominal bequests and the balance to his wife. The inumerable details and incidents which constituted the expression and demeanor of testator, all of which went to make up the impression to which the witness testified, could not be translated into descriptive language; and the witness having sufficient data from which to infer that the testator knew his children and the extent of his property, and having qualified himself by long and intimate observation, his conclusion was admissible.

Heinbach v. Heinbach.

*Held*, by FARIS, J., with whom the other judges concur,. that the testimony of the witness went directly to the ultimate issue to be found by the jury, and was an invasion of their province, and violated the rule that opinions of non-expert witnesses are to be confined to the one issue of insanity *vel non*; but as the questions and answers were not preserved for review by specific objections, the judgment should not be reversed because of the admission of the testimony.

10. **WILL: Proof of Execution: By One Witness.** The execution of a will may be proved by one of the subscribing witnesses; both are not necessary for that purpose. The will cannot be rejected simply because the absence of the other subscribing witnesses is not accounted for, for the proof of the will may be made by other sufficient testimony, and the testimony of the one subscribing witness as to its formal execution may be supplemented by that of other persons, such as the scrivener.

11. ———: ———: **Peremptory Instruction.** It is not error to instruct the jury that the instrument read in evidence was formally executed as to the signatures of the testator and the subscribing witnesses in the manner required by law, where the uncontradicted evidence is sufficient to establish its execution in due form; and especially is such an instruction not error where contestants in their pleading admit and assert its formal execution in unmistakable language, as they do in this case.

12. ———: ———: **Meaning: Making and Executing.** To "make a will" is to execute it. The common understanding of the words "making a will" is the writing, signing and attesting it in due form. The words "execute" and "execution," as applied to an instrument of writing, mean more than merely signing it; if a will, it is not executed until all the formalities prescribed by the statute are complied with, which are that it must be in writing, signed by the testator and attested by two or more competent witnesses subscribing their names thereto in his presence.

13. ———: **Right to Dispose of Property: Unfair Discriminaton: Instruction.** An instruction telling the jury that the testator had a right to dispose· of his property by will as he chose, even to the exclusion of his nearest relatives, and that the mere fact that the jury might believe the disposition unfair and unjust would not justify them in finding that it was not his last will, is a general statement of the law, does not single out facts, and is not error.

14. **REMARKS OF COUNSEL.** Where counsel did not so persist in arguing against the court's ruling that certain remarks were improper as to require a rebuke, the failure of the court to rebuke him was not error.

Appeal from Pike Circuit Court.—*Hon. Edgar B. Wool-folk,* Judge.

AFFIRMED.

*J. O. Allison, C. T. Hays, J. D. Hostetter, D. A. Ball* and *J. S. Fitzgerrell* for appellants.

(1) The court committed error in excluding the testimony as to the mental condition of Samuel Heinbach, and, his actions, manner, imaginations and hallucinations. The court erred in excluding the evidence as to his manner of talk and ability to talk and carry on a conversation and understand business transactions. The court erred in excluding the evidence as to Heinbach's drinking and as to the white horse. (2) The court erred. in excluding the evidence bearing on the issue of undue influence. (3) It was error for the trial court to give plaintiff's peremptory instruction to find for the will upon the issue of undue influence. This point was not in issue on the former appeal, and this court's ruling there is not *res adjudicata.* Turner v. Anderson, 260 Mo. 1. Besides, the evidence given at the last trial on the subject of undue influence was stronger and more abundant than that at the first trial. The evidence shows that the plaintiff began her campaign to get Heinbach's property before she was acquainted with him; before the marriage she made inquiries concerning him and how much property he had; she sought the acquaintance with Heinbach, and their first meeting was by her arrangement. And later she wanted a will made and wanted all of Heinbach's property willed to her, and engaged and employed John Hinkson to talk to Heinbach and to get him to make a will in her favor and offered to give him two of the best lots. Hinkson undertook this job and talked to Heinbach. All of Heinbach's property is willed to her; she makes all arrangements for working the will; she selects the scrivener and pays him; she selects the witnesses and arranges the time and place for making the will; she is present at the time and place of the making of the will—perhaps

not in the immediate room at the time, but there all the morning with him alone. Heinbach, the evidence shows, is in a passive, negative and listless condition and intoxicated to some extent, at least. (4) The court committed reversible error in admitting in evidence the divorce decree over the objection of defendants. Hughes v. Rader, 183 Mo. 714. (5) The court committed reversible error in admitting in evidence the certificates of acknowledgement to certain leases. (6) The court committed reversible error in admitting the evidence as to the mental capacity of Heinbach, because said witnesses had not qualified. (7) The court committed reversible error in permitting C. E. Perkins, over the objection of the defendant, to testify that Heinbach comprehended and had sufficient mind to comprehend who his children were and that he had sufficient mind to understand the nature and extent of his property and to whom he desired to give it. (8) The will itself was erroneously admitted in evidence. Its due execution was not shown. Miltenberger v. Miltenberger, 8 Mo. App. 306, 78 Mo. 27; Odenwaelder v. Schorr, 8 Mo. App. 464; Berst v. Moxom, 157 Mo. App. 348; Craig v. Craig, 156 Mo. 358; Bell v. Smith, 197 S. W. 128; Lamb v. Helm, 56 Mo. 432, Benoist v. Murrin, 48 Mo. 48. (9) Instruction 5, given by the court at the request of the respondent, was erroneous. It singled out and emphasized the testator's right to disinherit his children. Its effect was to mislead the jury into assuming that the justice or injustice of the disposition made by the will had nothing to do with the issues on trial and that the children had no natural call upon their father's bounty. Gay v. Gilliland, 92 Mo. 264; Wendling v. Bowen, 252 Mo. 688; Mowry v. Norman, 223 Mo. 470. (10) Instruction 6, given by the court at the request of the respondent, is erroneous. It purports to cover the whole case, and assumes that the alleged will was duly executed. It assumes a vital disputed fact. It is peremptory on such issue. State ex rel. v. Morrison, 244 Mo. 212; James v. Mo. Pac. Ry., 107 Mo. 480.

274 Sup.—20.

*Charles E. Rendlen, Pearson & Pearson* and *F. W. Neeper* for respondent.

(1)   Opinions of unsoundness predicated on a state of facts that do not show incompetency amount to nothing and give no force to such facts.   Winn v. Grier, 217 Mo. 449; Crowson v. Crowson, 172 Mo. 700; Sayer v. Westminster College, 192 Mo. 128; Sehr v. Lindeman, 153 Mo. 288; Riley v. Sherwood, 144 Mo. 354.   (2) The law requires something more than mere indefinite generalties to destroy or overcome the presumption of sanity. McFadden v. Catron, 138 Mo. 197; Riggin v. Westminster College, 160 Mo. 570; Hughes v. Rader, 183 Mo. 705.   (3) This court has held in this case, upon the same evidence offered or given in the present case, that the question of undue influence was properly out of the case.   Heinbach v. Heinbach, 262 Mo. 80.   (4) The statute provides for the introduction of certificates of acknowledgments in connection with the written instruments.   Sec. 2818, R. S. 1909; Bargee v. Bank, 204 Mo. 297; Albright v. Stevenson, 227 Mo. 340; 1 Corpus Juris, sec. 266, p. 886.   Appellants complain that the giving of respondent's instruction 5 was erroneous. A similar instruction to this was approved in the cases of: Moore v. McNulty, 164 Mo. 119; Hughes v. Rader, 183 Mo. 710; Maddox v. Maddox, 114 Mo. 47; Farmer v. Farmer, 129 Mo. 539; Aylard v. Briggs, 145 Mo. 612.   This fact, the formal execution of the will as to signatures of Samuel Heinbach and the witnesses thereto, in the manner required by law having been established by undisputed evidence, it was not error on the part of the court to give respondent's instruction 3, taking this issue from the jury.   Teckenbrock v. McLaughlin, 209 Mo. 538; Southworth v. Southworth, 173 Mo. 66, 74; Hughes v. Rader, 183 Mo. 700; Orcutt v. Century Blgd. Co., 214 Mo. 53; Phelps v. Zinc. Co., 218 Mo. 580; Cahill v. Chicago & Alton, 205 Mo. 407; Davidson v. Trust. Co., 211 Mo. 359; Stroblier v. Transit Co., 203 Mo. 714.   (a) In a will contest it is not essential to introduce all the witnesses attesting the execu-

tion of a will, and it is not error to fail to introduce the two attesting witnesses. One subscribing witness is sufficient to prove the execution of the will by himself and others in a suit to probate a will in solemn form. Lorts v. Wash, 175 Mo. 503; Avaro v. Avaro, 235 Mo. 429; Graham v. O'Fallon, 4 Mo. 608; Graham v. O'Fallon, 3 Mo. 510; Cheatham v. Hatcher, 32 Am. Rep. 650, 30 Gratt. 56; Ward v. Wilcox, 51 Atl. (N. J.) 1094; Pollock v. Glassel, 2 Gratt. (Va.) 439; Harper v. Wilson, 2 Marshall (Ky.) 467. (b) Appellants in their answer admitted the formal execution of the will. (c) Appellants admitted the will's execution by testator in the trial.

WHITE, C.—This action was brought in the circuit court of Ralls County by the widow of Samuel Heinbach to establish his will, it having been rejected by the probate court. The defendants are the children of Samuel Heinbach by a former marriage. The will was formally executed September 7, 1909; Heinbach died in Ralls County January 3, 1910.

This is the second appeal of this case. Its determination on a former appeal is reported in 262 Mo. 69. On this appeal it presents entirely different questions for solution.

The deceased, Samuel Heinbach, married his first wife, Sarah, at Richmond, Indiana, in 1872. Of this marriage three children were born—the defendants in this case. Some time about 1880 or 1885 he left his family in Indiana and came to Pike County, Illinois, where he was employed as farm-hand and wood-chopper. His wife and the two children they then had came to him and for a time lived with him in a cabin in the river bottom on the Illinois side; afterwards they lived for a short time in Hannibal, Missouri. Later, with his family, he returned to Cambridge, Indiana, where he stayed for some time. He left them again and came back to the Mississippi River bottom and engaged on the Missouri side in a sort of partnership with one Johnson in chopping wood. The two bought a tract of

land of fifty-two acres in Ralls County, a few miles south of Hannibal. This land later was partitioned equally between the two by verbal agreement, which afterwards was ratified by deeds. This happened some time in the middle eighties. Heinbach lived on his half until his death in 1910.

In 1901 a cement plant was erected upon the land adjacent Heinbach's tract, the town of Ilasco sprang up there and spread out over Heinbach's land, making it very valuable. Without filing any plat he laid off his ground in lots and rented out those lots to various persons who built on them. This ground rent amounted to more than a hundred dollars a month—a princely income for him. It probably was this unaccustomed affluence which led to his ruin. He always had a weakness for strong drink, and the testimony shows that from the time the cement plant was established until his death, nearly ten years later, he was almost constantly drunk.

His first wife, back in Indiana, married again about 1896, without troubling herself about first divorcing him. Heinbach, probably in ignorance of that event, procured a divorce from her in 1906, in Ralls County, and married the plaintiff in the early part of 1909.

The defendants in their answer allege mental incapacity to execute the will, and undue influence. The issue of undue influence was removed from the consideration of the jury by instruction, leaving only the issue of mental capacity for their consideration.

A great number of witnesses were introduced and their testimony fills a record of more than 1200 pages. Every incident which could be found to throw light upon Heinbach's capacity was described in the evidence. His entire life was lighted up as with Roentgen rays, and exposed to the scrutiny of the jury. The doctors who attended him in sickness, the lawyers who transacted business with him for other people, those who leased lots from him and paid him rent, the nurse he had, his housecleaner, washwoman, butcher, fish peddler, those who sold him vegetables, and groceries, and

tobacco; those whom he worked for, those who worked for him and with him; those who sold him drink and those who got drunk with him, were drawn upon without limit to tell what they knew about his habits and characteristics. In the neighborhood of forty witnesses who had known him and had more or less important business transactions with him testified that they thought him sane at the time of signing the will. A much smaller number, less than half, testified that in their opinion he was insane. It was shown that he was drunk a great part of the time; that he was of extremely filthy habits, due to an unfortunate ailment which made him a very repulsive object; that he went about the streets in a condition which was very disgusting; that he had visions of a white horse which was going to ride across his possessions in Ilasco. The account given by the witnesses of that matter leaves one in doubt as to whether the white horse, as he spoke of it, was an apparition or a figure of speech.

Fifty or sixty specific business transactions were detailed by the witnesses, in addition to statements by storekeepers and others who testified that they dealt with him at times. Some fifty or sixty leases executed by him upon the various vacant lots into which his land was divided, were introduced. These leases bore dates extending from 1905 to 1909. Ten of them appear to have been executed in 1909, nine of them in 1908, and others in prior years. The holders of a number of these leases were introduced as witnesses to testify to the circumstances under which they procured them. Their testimony tended to show that Heinbach carried the numbers of his lots in his head, that he knew what he was doing when he leased the ground, and when he conducted other business matters mentioned in the testimony. It was shown that he refused to sell his land though often importuned to do so. It appeared that he knew his weakness and was afraid he would squander the proceeds of any such sale. He refused to transact business when he was drunk and always would defer any

business matter which might be presented to him until a time when he would be sober. No business transaction was mentioned by any witness, so far as we could discover in the record, and none is pointed out to us by the appellants, in which the testator failed to understand the nature of the transaction. One of his physicians testified, and was corroborated by an expert or two, that he was suffering from alcoholic dementia which so impaired his mental powers that he was unable to know that he was making his will. This doctor's testimony was to a certain extent discredited by witnesses who testified that the same doctor had stated on several occasions that Heinbach was sane. Another physician testified that he was perfectly sane and capable of transacting the business under consideration. He had employed at time three different real estate agents to collect his rents and transact his other business. Whether this was on account of his knowledge of his inability to transact business or his desire to be free to get drunk when he wanted to or his general physical incapacity, is not fairly shown.

One of the witnesses to the will testified for the plaintiff. The other was not called. The scrivener who wrote the will testified for the defendants and his testimony tended to show a very clear understanding by the testator of what he wanted to do with his property and a perfect knowledge of those who had claims upon his bounty.

The verdict of the jury at the first trial was that the instrument under consideration was not Heinbach's will. This court reversed the judgment on account of an erroneous instruction. On the last trial the verdict was the other way—to the effect that the instrument was his will; that judgment was appealed from and. is the matter before us here.

I. Complaint is made of the rulings of the trial court in excluding evidence tending to show undue influence, and in the giving of a peremptory instruction

Heinbach v. Heinbach.

**Undue Influence.** to the jury withdrawing that issue from their consideration. It is claimed that the evidence offered on the last trial was stronger as tending to show undue influence than that offered on the first trial, which this court held on the former appeal was insufficient to submit that issue to the jury. The evidence not being fully set out in the former opinion, we are unable to make the comparison. Suffice to say that the evidence offered and excluded, taken together with all the evidence admitted which it is claimed tends to prove undue influence, is insufficient, according to the ruling of this court, to submit that issue to the jury and the peremptory instruction was proper. [Gibony v. Foster, 230 Mo. l. c. 136-7, and cases cited.]

The most that can be said of the testimony excluded is that Mrs. Heinbach sought the marriage with the old man because of his money. That she discharged the duties of a good wife, that his appearance and habits· were much improved by the marriage, and that he entertained a true affection for his wife appears without dispute. No evidence, direct or circumstantial, was offered tending to show that she did anything or said anything which had any tendency unduly to influence Heinbach in making the disposition of his property which he made. The remarks of the court in the Gilbony case upon the point, at the pages cited, are pertinent.

II. The decree of divorce which Heinbach obtained from his first wife in 1906 was admitted in evidence. **Divorce.** It was objected to on the ground that it was *res inter alios acta,* and the ruling of the court in admitting it is assigned as error.

It was competent for the purpose of proving the fact that the deceased had been divorced from her. His children by that wife were parties defendant. It would tend to explain the present relation which he sustained to them, and throw light upon the reasonableness or unreasonableness of his bequests, and thereby his mental

capacity. Any fact touching his relation to defendants was admissible.

III. A large number of leases extending over a period of several years, from 1905 until the death of the decedent in 1910, were offered in evidence; the leases themselves were not objected to, but the defend-
Leases.      ants objected to the certificates of acknowl-
edgment which were attached to them. These were admitted over their objections, and the ruling is claimed to be error.

The certificates of acknowledgment were admissible for the purpose of showing that the leases were executed. The leases themselves would prove nothing as to the business transactions or negotations conducted by the deceased unless it was shown that he executed them, and the acknowledgements were admissible for that purpose. [R. S. 1909, sec. 2819; Barbee v. Bank, 240 Mo. 1. c. 306.] It would have been proper to instruct the jury that the certificates were admissible only for that purpose, but no such instruction was asked.

VI. Proof was offered and some evidence admitted over strenuous objection by defendants, to show that buildings and improvements were erected on the lots
Improvements.      which deceased had leased to various per-
sons. It was shown without objection that Heinbach had leased a great many lots on his tract of ground, the leases being introduced. Numerous witnesses who had leased these lots related the circumstances attending the transactions of making the leases, and in that connection it appeared that these persons were in various kinds of business and had buildings on these several lots. Such buildings were sold from time to time and in each case Heinbach had been asked about and had consented to the transfer of the lease to the purchaser; so the existence of such improvements on various lots was before the jury without objection, and we cannot see that additional specific statements

that improvements were made would add anything to that fact, if it were incompetent.

V. Error is assigned to the rulings of the trial court in excluding the testimony of several witnesses for defendants. The questions which these witnesses were not permitted to answer are of two general classes: One kind sought the opinions of the witnesses as to Heinbach's sanity, and the other kind called out the conclusions of the witnesses as to certain facts. Of those witnesses who were not permitted to state their opinions as to sanity in answer to direct questions, some had had no talk with the decedent and had not heard him talk under circumstances such as would make them competent to judge whether he was sound or unsound mentally. One witness was asked whether witness was of sound or unsound mind, and when he answered that deceased was weak-minded and easily influenced, his answer was striken out as not responsive to the question. Other witnesses were not permitted to give opinions as to whether Samuel Heinbach was of sound or unsound mind when they never had heard Heinbach talk on any subject. Others did not qualify because they said Heinbach was drunk when they tried to talk to him and they never succeeded in carrying on a conversation with him.

Of questions of the other kind, in some cases a general statement was ruled out, but witness was allowed to tell the same thing more specifically. For instance, when one witness, Dora Doyle, said "he never talked like he had much sense to his talk," the statement was striken out; but the same witness was immediately allowed to answer the question in this way: "I don't recollect what he said because I don't remember, but he would say one thing that had no connection and jump off on something else."

One witness, William Hascall, was not allowed to answer the question as to whether Heinbach, the last few years before his death, could carry on a connected

*Opinions and Conclusions.*

conversation, but when asked to describe his manner of talk he answered: "It would be just drunk talk, he would try to talk and couldn't." Mrs. Iva Lee said: "He would sit there and mutter and I couldn't get any sense out of it." This was stricken out, but when asked if she could describe his manner of talk, immediately she answered, "No sir, just mutter, I couldn't understand him; that is all I know," and this was allowed to stand.

Other witnesses were not allowed to answer when asked about Heinbach's hallucinations and imaginings. They were required to state the facts as to what Heinbach said and this they accordingly did.

In no case was any fact as to Heinbach's demeanor, or touching upon his capacity, excluded from the testimony. Witnesses were permitted to go into detail in relating all the particulars of his life, his method of transacting business, and his habits, and their conclusions as to his sanity were ruled out only where they had neither had business transactions with him nor witnessed business transactions of his.

The court was not in error in ruling upon this evidence.

VI. Associated in principle with the point considered in the last paragraph, the appellants assign error to the admission of the testimony of twenty-three witnesses who testified for the plaintiff giving their opinions as to the sanity of the deceased, the objection in each case being that the witness had not qualified. The court followed a consistent line in ruling upon this character of testimony and was somewhat liberal to both sides in the matter. An opinion as to the sanity of the deceased was permitted to be stated by any witness for either side who had qualified by showing that he had had business dealings with him or had witnessed his business transactions, and excluded all who had not conducted or witnessed any business dealings of his. All the twenty-three witnesses whose testimony was

Qualification of Witness.

admitted and objected to, as stated, had had business transactions with him, some of them extending over a period of many years, excepting two or three, and these two or three had seen him when engaged in some business transactions. The court did not err in overruling the objections to this testimony.

VII.   Counsel for appellant set out the testimony of several witnesses which was admitted and claim there was error in such admission. In some of these instances the record shows no objection was made and no General exception saved. In others · the objection Objections. was that the question was "not proper," or, "incompetent, irrelevant and has no bearing on the case and an improper method of showing mental condition." Objections to evidence of this character must state the specific grounds of the objection, otherwise the alleged error will not be reviewed. We could not convict the trial court of error in refusing to sustain an objection expressed in such general terms. [Springfield v. Owen, 262 Mo. 92, l. c. 104; State ex rel. v. Diemer, 255 Mo. 336, l. c. 346-51.]

To certain questions and answers, however, the objection was sufficiently specific, as follows:

"Q. Mr. Perkins, at the time this transaction was occurring, at the time you were there, I will have you state whether or not Mr. Heinbach com- Non-Expert prehended and had sufficient mind to com- Conclusion. prehend who his children were? A. Yes sir.

"Q. I will ask you whether or not he had sufficient mind to understand the nature and extent of his property and to whom he desired to give it? A. He did."

The witness was one of the witnesses to the will and had described the circumstances surrounding the signing and attestation of the will.

The objection to this testimony is different from that considered in the preceding paragraph, where the

objection was that the witnesses were not qualified. It was conceded that a witness, if properly qualified, might give an opinion. The objection here is that the questions called for *conclusions* of the witness and no objection is made that he was not qualified.

Opinions of non-expert witnesses often are treated with scant consideration by the courts. While they are admissible under certain circumstances, it is often said that they are of no probative force unless the witness qualifies by showing he knows sufficient facts from which to draw his conclusions. [Crowson v. Crowson, 172 Mo. 691, l. c. 702; Gibony v. Foster, 230 Mo. 106, l. c. 132-3; Winn v. Grier, 217 Mo. 420, l. c. 450; Wood v. Carpenter, 166 Mo. 465, l. c. 487.]

Whether such opinions may be received at all depends upon the nature of the facts from which they are drawn. A non-expert witness may give his conclusions or deductions when the matter is one which a witness of ordinary intelligence can understand, and such conclusions or deductions of the witness are based upon facts which are incapable of being properly or accurately described by the witness to the jury. If the witness, clearly and accurately, can give the facts upon which he might base a conclusion, then it is for the jury to draw the conclusion, and the opinion or deduction of the witness is improper. The witness is required to qualify and show that he knows the facts from which he draws his conclusion and must state them as far as he properly can, and if the circumstances are such that they are not susceptible of complete and accurate portrayal before the jury, the witness may state his conclusion, "the inference being an equivalent to a specification of the facts; . . . in other words, when the opinion is a mere shorthand rendering of the facts, then the opinion can be given, subject to cross-examination as to the facts on which it is based." [Rearden v. Railroad, 215 Mo. l. c. 137; Conn. Mut. Life Ins. Co. v. Lathrop, 11 U. S. 612, l. c. 620; Partello v. Railroad, 217 Mo. 645, l. c. 656; State v. David, 131 Mo. 380, l. c. 395;

State v. Buchler, 103 Mo. 203, 1. c. 207; Kirchof v. United Ry. Co., 155 Mo. App. 70, 1. c. 83-4; Fulton v. Met. St. Ry. Co., 125 Mo. App. 239, 1. c. 246; Duthey v. State, 131 Wis. 1. c. 187; Lewis v. Mason, 109 Mass. 169, 1. c. 174; McKee v. Nelson, 15 Am. Dec. 384, 1. c. 385; State v. Rumble, 81 Kan. 1. c. 18; Bacot v. State, 96 Miss. 1. c. 129.]

As said in connecticut Mutual Life Insurance Co. v. Lathrop: "In form, it is opinion, because it expresses an inference or conclusion based upon observation of the appearance, manner, and motions of another person, of which a correct idea cannot well be communicated in words to others, without embodying, more or less, the impressions or judgment of the witness."

In Kirchof v. United Rys. Co., 155 Mo. App. 1. c. 83, the court said: "Even non-expert witnesses are permitted to state their conclusions of fact as facts where the basic facts are of such nature that they cannot be reproduced to present to the jury the picture impressed on the mind of the witness. The impression or conclusion becomes an evidential fact."

And this court in State v. Buchler, 103 Mo. 1. c. 207, said: "Witnesses are allowed to testify to their impressions or opinions on such matters, for want of any other way to get the evidence before the jury; they admit of no more definite proof."

In this case the witness had known Heinbach for three years and during that time had seen him every day and sometimes twice a day; he conducted a store at which Heinbach bought tobacco. The will of deceased had been read in his presence and that of the two witnesses, and in the will the children all were mentioned— two of them by name and the other identified, the name being unknown to the testator; the will disposed of all of his property to his wife, except the nominal bequests to his children. The innumerable details and incidents which constituted the expression and demeanor, the attitude and actions of Heinbach, all of

which went to make up the impression to which the witnesses testified, could not be translated into description language. The only way the witness could say it was to give his conclusion, as it was given. He had sufficient data from which to infer that the deceased knew who his children were and the extent of his property. We think the testimony was competent under the rulings quoted above.

Appellants are hardly in position to say, now, they were harmed by those questions and answers because immediately they introduced the scrivener who wrote the will and proceeded to prove by him that the testator did in fact know who his children were and what he wanted to do with his property.

VIII.    Appellants strenuously assert that the will itself was erroneously admitted in evidence, arguing that its execution was not sufficiently proved for the reason **Formal** that only one attesting witness was sworn **Execution.** at the trial and the absence of the other not accounted for; and further, that the regular formalities in the execution of the will were not proved even by the witness who did testify. It has been held repeatedly in this State that a formal request by the testator to the witness to sign the will and a formal declaration that it is a will, are not necessary. It is only necessary that the parties understand that he intends it to be his will, that he expects the witnesses to sign it as such, and that he and the witnesses sign it in the presence of each other under circumstances showing that they all understand the purpose and effect of the instrument. [Martin v. Bowdern, 158 Mo. 379; Hughes v. Rader, 183 Mo. 630; Carlson v. Lafgran, 250 Mo. 527; Thomas v. English, 180 Mo. App. 358, l. c. 365; Southworth v. Southworth, 173 Mo. 59.] It also frequently has been held that the execution of the will may be proved by one of the subscribing witnesses and that both are not necessary for that purpose. [Avaro v. Avaro, 235 Mo. 424, l. c. 429; Lorts v. Wash, 175 Mo. l. c. 503; Craig v. Craig, 156 Mo. l. c. 363.]

Heinbach v. Heinbach.

There are some cases which indicate that one witness is insufficient to establish a will unless the absence of the other witness is accounted for. In this case, as stated, only one witness to the will testified, though the record shows that the other witness was in the court-room at the time. The attorneys for respondent say in their brief that the other witness, on the former trial, swore the testator was not of sound mind at the time he executed the will, in direct impeachment of his attestation. It is claimed also that that witness was instrumental in working up the case in behalf of the defendants. That matter is not in the record.

Those cases which indicate that one witness is insufficient are where there is no other testimony and the absent witness unaccounted for. The purpose of the witness on the trial is to prove the will was executed. That proof might be made without the presence of either of the subscribing witnesses; or, even if they both were present and swore that the will was not properly executed, it still might be proved by other sufficient testimony. In this case the only subscribing witness who testified, swore that Mrs. Heinbach requestioned him to go to the house for the purpose of attesting the will, and he did so with the other witnesses; that the scrivener was there and requested them to return in an hour, during which time he was preparing the will. The two witnesses returned and the will was read in the presence of the testator and the two witnesses; then it was signed by the testator and the two witnesses, and retained by the scrivener who took it away with him.

If this testimony was insufficient to prove the formal execution of the will, the defendants, instead of standing upon their objection to it, supplemented it by introducing the scrivener who wrote it. He was requested, he testified, by Mrs. Heinbach to go to the house and he arrived there with the two witnesses. He asked Mr. Heinbach on what business he had sent for him. The testator replied that it was to prepare

his will. The witness then asked Heinbach how he wanted the will made, what disposition he wanted made of his property, and he replied he wanted to make it all to his wife. Witness asked him then if he had any children. He said he had three, and gave the names of two, and stated he did not know the name of the third, who was probably born after he left his wife, and it was written in the will that way. The witnesses soon returned and one of them asked to have the will read. The scrivener read it in the presence of Heinbach and the two witnesses and threw it on the table. At this point the evidence of the witness is peculiar. He didn't see anybody sign it. Whether he left the room, or turned his back, or shut his eyes, or was for a moment afflicted with a spasm of insensibility to his surroundings, he does not explain, but presently he picked up the will and it was signed by the testator and each of the witnesses. He was certain the signature of Heinbach, and that of the witness Wilson, were genuine; he didn't know the handwriting of Perkins (who had just testified that he signed it). He put the will in an envelope, sealed it and retained it until after the death of the testator. He testified that he knew nothing about the family of Heinbach before he went there and obtained all information regarding the children from Heinbach. He stated that he didn't ask anything about Heinbach's property because he knew all about it already. Under these circumstances the proof of the formal execution of the will was entirely sufficient to admit it in evidence. [See Carlson v. Lafgran, 250 Mo. l. c. 535.]

Another reason why appellants are not in position to urge that the will was not admissible in evidence appears in their answer, as will be seen in considering the next objection.

IX. The same in principle as that last considered is the objection to instructions 6 and 7, given for plaintiff, which told the jury that if Heinbach knew and un-

Heinbach v. Heinbach.

_____:
Instructions.

derstood the nature and extent of his property and what disposition he was mak- ..ing of it, and to whom he was giving it, and who were the natural objects of his bounty, then they were to find in favor of the validity of the will.

The objection to these instructions is that they assume that the will was formally executed, and limit the consideration of the jury to the one issue of mental capacity of the testator.

The jury were limited to that issue by a further specific instruction, number three, for plaintiff, which told them the instrument read in evidence was formally executed as to the signatures of Samuel Heinbach and the witnesses, in the manner required by law. This last mentioned instruction could not mislead the jury by allowing them to infer that the will was legally and intelligently executed. Other instructions for both plaintiff and defendants set forth what they must find in order to declare the instrument Heinbach's will; the real issue submitted could not be mistaken. The instructions for defendant defined the capacity necessary on the part of the testator to make the will and in the same terms as those used in the instruction given on behalf of the plaintiff, and required the proponents of the will to prove that the testator possessed such capacity before they could find that the instrument under consideration was his will; exactly the converse of plaintiff's instructions.

Another instruction given on behalf of defendants placed the burden of proof upon the plaintiff and called the attention of the jury to what particular facts plaintiff must prove by the greater weight of evidence before they can find the issues for the plaintiff.

The instructions given for plaintiff and those given for defendant are entirely in accord and harmonious upon the issue, and the only issue, presented to the jury, and agree exactly in the terms used to define that issue.

274 Sup.—21

So it is only necessary on this point to determine whether the court was right in confining the inquiry to the question whether Heinbach had sufficient mental capacity to make a will, and removing from consideration the matter of its execution, as to form and attestation.

What we have said under the previous paragraph seems sufficient to settle the point. The defendants themselves in aid of plaintiff's witness, proved by the scrivener that it was in fact signed and witnessed in due form, and no evidence of any kind was offered to contradict that testimony.

However, there is another entirely sufficient reason why that issue was foreclosed to the defendants. The answer of defendants, after admitting that "a certain instrument purporting to be the last will and testament of the said Samuel Heinbach" was filed for probate and rejected by the probate court, and denying general allegations of the petition, alleges:

"That said paper writing is not the last will and testament of said Samuel Heinbach, deceased, but that *the same was made* at a time when the mind of deceased was impaired by old age, disease, physical suffering and bodily decay and dissolution, and by the use by deceased of strong drugs, medicines, stimulants and intoxicating liquors, so that he had no knowledge or understanding of *what he was doing* at the time he was induced, as hereinafter stated, to go *through the form of executing said purported will.*"

The answer then alleges that at the time said writing was purported to have been executed, the mind of deceased was impaired so that he was incapable of understanding or appreciating, "*what disposition he had made or was making of his affairs therein,* and that he did not comprehend or understand its meaning, or effect." And further: "That the plaintiff, knowing the exact condition of said Heinbach's mind at said time, by coercion, threat, duress, fraud and over persuasion dominated the mind of said Samuel Heinbach *and pre-*

*vailed upon and coerced his making a will in her favor,*
and to the total exclusion of the children of said deceased, who were born of a prior marriage of said deceased, and that said pretended will *is the result and product of said fraud,* coercion, threats, duress and over persuasion so practised upon said Samuel Heinbach by plaintiff and is not the will of deceased."

It certainly never occurred to the pleader that there was an issue as to whether the will was signed and properly witnessed. Otherwise he would not have expressly admitted that deceased went *"through the form of executing the purported will,"* or *"that the same was made,"* or that plaintiff "prevailed upon and coerced *his making a will in her favor."*

If words mean anything the formal execution of the will is admitted, asserted and reiterated. To "make a will" is to execute it. The common understanding of the words "making a will" is the writing, signing and attesting it in due form. The words "execute" and "execution," as applied to instruments of writing, mean more than merely signing them. A deed or contract is not executed when it is signed, it must also be delivered before it is executed. [3 Words and Phrases, 2558; Copying Co. v. Muleski, 138 Mo. App. l. c. 423.] A will is not "executed" until all the formalities prescribed by the statute are complied with. [Linton's Appeal, 104 Pa. St. 228, l. c. 239; Sec. 537, R. S. 1909.] This section of our statute provides that a will shall be in writing, signed by the testator and attested by two or more competent witnesses subscribing their names to the will in the presence of the testator. It is not executed until all that is done.

So when the answer makes those allegations, and assigns, as the only reasons for the invalidity of the will, undue influence and the inability of the testator to understand what he was doing, that is an admission that the signing and witnessing of the will were in the form required by the statute. The allegations effectually removed from the consideration of the court and jury

all defects in its execution except the alleged want of capacity.

X. Error is assigned to the giving of instruction numbered 5 which told the jury that Samuel Heinbach had a right to dispose of his property by will as he chose, even to the exclusion of his near-
Instruction: est relatives, and the mere fact that the
Unjust
Discrimination. jury might believe the disposition unjust and unfair would not justify them in find-ing that it was not the last will of Samuel Heinbach. An instruction in this identical form was approved by this court in Moore v. McNulty, 164 Mo. 1. c. 119. The instruction does not single out facts, but is a general statement of the law as fully recognized by this court. [Hughes v. Rader, 183 Mo. 1. c. 710; Farmer v. Farmer, 129 Mo. 539.]

XI. While counsel for plaintiff were arguing the case to the jury, defendants' counsel interposed numer-
Remarks of ous objections to the remarks made; in each
Counsel. instance the objection was sustained. Appel-lants assign as error the failure of the court sufficiently to rebuke the orator in each instance. An examination of those remarks shows that some of them were entirely within the limits of proper argument, and in none of them did the attorney persist in arguing against the court's ruling so as to require a rebuke, and as the record shows the incidents the simple sustaining of the objections probably left the matter as harming the plaintiff more than the defendant.

The case was tried with consummate ability and in-dustry. It was fought through with pertinacious and aggressive determination on both sides, and fairly and impartially managed by the trial judge. There is no reason why the verdict of the jury should be disturbed.

The judgment is affirmed. *Roy, C.,* not sitting.

PER CURIAM:—The foregoing opinion by WHITE, C., is adopted as the opinion of the court. All of the judges concur.

Heinbach v. Heinbach.

FARIS, J. (concurring)—I concur in the result reached in this case, but I do not agree that either a lay witness, or an expert witness, may express an opinion as to the *quantum* of the alleged insanity with which the person whose mental condition is the subject of the judicial inquiry, is, or was afflicted. That is, such a witness will not be permitted to say that the insanity of the testator was such as to destroy his testamentary capacity, or to render the testator incapable of comprehending and understanding the several elements by which such capacity is tested. Conversely, the witness will not be permitted to say that the testator was mentally capable of making a will, or that he comprehended and understood the specific elements mentioned in the questions propounded.

I put my concurrence touching this point upon the ground that the objection made, *upon this specific phase,* to the introduction of this erroneous testimony was not sufficiently explicit to call the attention of the trial court to the vice thereof. A witness is not to be permitted to express an opinion upon the questions directly in issue, and thus invade the province of the jury. Herein, it was for the jury to find whether the testator had sufficient memory and mental capacity to comprehend who his children were, to understand the nature and extent of his property and to know to whom he desired to give it. [Deiner v. Sutermeister, 266 Mo. l. c. 522; State v. Klinger, 46 Mo. 224; Kane v. Railroad, 251 Mo. 13; Castanie v. Railroad, 249 Mo. 192; 17 Cyc. 238; Thomasson v. Hunt, 185 S. W. l. c. 167; May v. Bradlee, 127 Mass. 414; Runyan v. Price, 15 Ohio St. 1; Schneider v. Manning, 121 Ill. 376; Marshall v. Hanby, 115 Iowa, 318.] The comprehension inquired about and the capacity to know and understand the nature and extent of a testator's property and to whom testator desires to give it are chief among the ultimate tests of testamentary capacity, and these elements comprised practically the whole of the issues required to be found by the triers of fact.

It must be conceded, of course, that broadly, the issue of insanity *vel non* in a will contest, is one of the issues to be passed on by the triers of fact, and that the opinion which the law permits a lay witness to give touching this issue ordinarily constitutes an invasion of the jury's province. But the practice of offering such opinions is now firmly fixed and well settled. We excuse such an invasion of the jury's province by limiting the opinion of the witness to the fact of insanity; leaving to the jury to find the *quantum* thereof, and whether such *quantum* is sufficient to destroy the testamentary capacity of the testator.

In my opinion the questions asked violated the rule stated, and the answers thereto would have constituted reversible error if the point had been preserved by a proper objection. I concur in the result therefore.

*Walker, P. J.,* and *Williams, J.,* concur in these views.