JOHANNA ROCK et al. v. ROBERT KELLER et al.,
Appellants.

Division Two, January 6, 1926.

1. **PLEADING: Will Contest: Undue Influence: Withdrawn from Jury.** Where the issues of fraud, coercion and undue influence are withdrawn from the consideration of the jury, the sufficiency of the petition to state a cause of action upon any one of such issues is not for consideration on proponents' appeal from a verdict and judgment setting aside a will.

2. ———: **Testamentary Capacity: No Demurrer: Trial without Objection.** Where the sufficiency of the petition was not challenged in the trial court by demurrer, motion or otherwise, but the case was tried on the theory that the petition charged that testatrix was of unsound mind at the time the will in contest was alleged to have been executed, and evidence tending to support this issue was produced by contestants, without objection, and evidence was introduced by proponents tending to prove that she executed the will and was of sound mind and disposing memory at the time and that it had long been her settled policy to dispose of her property as in

the will declared, a petition, though inartificially drawn, which substantially tenders the issue of a lack of testamentary capacity, will be held, after a verdict for contestants, sufficient to state a cause of action on that issue.

3. ———: ———: **Right to Amendment: Considered Made.** Even if the averments of the petition were technically insufficient to raise the issue of a lack of testamentary capacity, it will on appeal be considered to have been amended to correspond to the proof showing a lack of such capacity and clearly entitling respondents to such amendment.

4. **WILL CONTEST: Evidence: Feeble Intelligence: Transaction of Business.** Testimony of neighbors and acquaintances that the aged testatrix was a woman of feeble intelligence and that her sister, with whom she lived and who was a joint tenant with her in the property, transacted all the business pertaining to it, while testatrix, under the supervision of the sister, did the housework and errands assigned to her by the sister, is admissible as evidence bearing on the issue of testatrix's mental capacity to make a will.

5. ———: ———: **Owner's Reasons for Placing Title in Testatrix: Business Incapacity.** Testimony by an attorney that testatrix's aged maiden sister, the owner of the real estate in suit, consulted him in the presence of testatrix, and was very solicitous about the future of testatrix, also old and unmarried, in the event that she (the sister) should die, and in the presence of testatrix said that testatrix was not capable of taking care of herself or the property and for that reason she desired to protect testatrix in the enjoyment of it until her death from the claims of her other relatives, and that as a result of said consultation the sister, upon his advice, caused the title to be conveyed to both of them as joint tenants, is competent evidence bearing on the issue of the capacity of testatrix to make the will in contest a few hours after the sister's death and one day before her own death.

6. ———: ———: ———: **Attorney: Privileged Conversation: Timely Objection.** Objection that testimony detailing the reasons of testatrix's sister for conveying her property to testatrix, among others, that testatrix was not capable of taking care of herself, was a privileged conversation between attorney and client, should be made at the first opportunity; otherwise, the privilege is waived. A motion to strike out the testimony after it has been given comes too late. In this case the evidence fails to show that the relation of client and attorney existed between the testatrix and the witness, but only shows that the conversations concerning testatrix between the attorney and her sister took place in her presence.

7. ———: ———: **Deposition for Purposes of Contradiction.** The deposition of a contestant to the effect that one of the beneficiaries of a will had stated to him that testatrix did not possess testamentary capacity is not competent, as original evidence, where there are other beneficiaries who were not present when the statements were expressed; but such part of the deposition is competent to contradict the testimony of said beneficiary after he has testified that he never made any such statements. For the sole purpose of contradicting the testimony of a proponent who denies that he ever made statements tending to show that testatrix was not of sound mind at the time she executed the will, the statements of a contestant to whom they were made in the absence of other proponents are admissible.

8. ———: ———: **Expert Opinion: Conclusion: Invasion of Province of Jury: No Exception.** In a suit to set aside a will for the lack of testamentary capacity, an unanswered question propounded to a physician who was asked to state "whether a woman in the condition in which you found testatrix would have had a knowledge of the extent, nature and value of all her property and of the persons who would be the natural objects of her bounty, and be able to hold them in her mind for a sufficient length of time to direct disposition of them" cannot be held to be an invasion of the province of the jury; and where the answer of the witness was that the testatrix was irrational and dying, and a motion to strike out the answer as irresponsive to the question was overruled, but no exception was saved, the question of the competency of the witness to state his conclusions as to the ultimate fact to be found by the jury is not for consideration, since there was no answer to the question propounded, and no exception was saved to the final ruling, and the witness was competent to give his opinion as to the sanity of testatrix.

9. ———: ———: ———: ———: ———: **General Objection.** An objection to a question propounded to an expert witness that "it is highly improper, incompetent and should be excluded" is too general, and cannot be considered as an objection that the question calls for a conclusion or that the answer would be an invasion of the province of the jury to find the ultimate fact.

10. ———: ———: **Standard of Capacity.** A question propounded to a physician "whether a woman in the condition in which you found testatrix would have a knowledge of the extent, nature and value of all her property and of the persons who would be the natural objects of her bounty, and be able to hold them in her mind for a sufficient length of time to direct disposition of them" sets a proper standard of testamentary capacity,

Rock v. Keller.

11. ———: ———: Insanity: Conclusion: Invasion of Province of Jury. In a suit to set aside a will for lack of testamentary capacity, it is permissible to ask a physician, who attended the testatrix up to the time she made her will, if she was sane or insane, and neither the question, nor his answer that she was irrational and dying, is an invasion of the province of the jury to find the ultimate fact whether she was of sound mind when she executed the will.

12. ———: ———: Expert Opinion: Hypothesis. The hypothetical question propounded to a physician in this case properly hypothesized the facts shown in evidence by contestants of the will.

13. ———: Mentally Sound at Moment of Execution: Directed Verdict for Proponents. Where the petition seeks to have testatrix's will set aside for lack of testamentary capacity, evidence is competent to show the condition of her mind long prior to and closely approaching the time of its execution, as well as her condition of mind soon after its execution, in order to show her state of mind at the very time of its execution. Where the testimony of experts was that testatrix was delirious on the night before the will was executed at ten o'clock next morning; one physician saw her within a half hour before and within an hour after its execution, and testified that she was suffering from pulmonary edema, which indicated death; that she was irrational and dying; that he did not see her at the time the will was executed, but he knew her condition then, not by observation, but pathologically; that her disease was progressive; that it caused her death on the next day after its execution, and that in his opinion she was irrational and dying at the time of its execution; his diagnosis was not questioned, but was confirmed by the hospital records and the *post-mortem;* and there was much evidence that testatrix, while in good health, was feeble-minded and unable to transact business or to protect her interest, the court could not direct a verdict for proponents, on the ground that the evidence was uncontradicted that at the very time the testatrix executed the will she was of sound mind and disposing memory.

14. ———: Instructions: No Evidence. Appellants cannot complain that there was no evidence to support an instruction given for the respondents where they asked and received an instruction submitting the same issue.

15. ———: Mental Capacity: Tests. An instruction in a will contest telling the jury that "in determining the issue of sufficient soundness of mind or testamentary capacity, possessed by the testator, to make a, will, you are instructed that if a person has not mind and memory enough to understand the ordinary affairs of life, the value, extent and nature of his property, the number and names of

the persons who are the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessity, and has not active memory enough to retain all these facts in his mind long enough to have his will prepared, he has no capacity to dispose of his property by will," has often been approved by this court.

16. ———: Burden: Prima-Facie Case: Instruction. In a suit to set aside a will for lack of testamentary capacity, the court should not instruct the jury that upon making formal proof of the execution of the will the proponents made a prima-facie case and the burden then shifted to the contestants to overcome the prima-facie showing, and if they had not successfully carried such burden the verdict must be for proponents. The burden is not met by making out a prima-facie case, but remains upon proponents throughout the trial.

17. ———: ———: Feebleness, Etc. An instruction should not contain a clause that "either old age, sickness, feebleness, bodily infirmity nor weakness of mind incapacitates a person to make a will" where there is evidence that testatrix had long been feeble-minded and at the very time of signing the will was irrational and in a dying condition, since, while a correct statement of abstract law, it tends to minimize, if not to destroy, such evidence.

Appeal and Error, 3 C. J., Section 623, p. 727, n. 99; Section 733, p. 819, n. 26; p. 822, n. 27; 4 C. J., Section 2556, p. 662, n. 82; Section 2625, p. 713, n. 68; Section 2633, p. 750, n. 92; Section 2901, p. 928, n. 73. Evidence, 22 C. J., Section 759, p. 668, n. 73; Section 760, p. 669, n. 83, 95; Section 803, p. 713, n. 95. Trial, 38 Cyc., p. 1648, n. 27; p. 1711, n. 19. Wills, 40 Cyc., p. 1004, n. 3; p. 1021, n. 12; p. 1022, n. 19; p. 1023, n. 21; p. 1024, n. 32; p. 1028, n. 74 New; p. 1036, n. 35; p. 1269, n. 31; p. 1331, n. 42; p. 1334, n. 66, 70; p. 1335, n. 76; p. 1339, n. 5; p. 1360, n. 88. Witnesses, 40 Cyc., p. 2393, n. 27, 28; p. 2394, n. 29; p. 2395, n. 41; p. 2397, n. 60; p. 2777, n. 77 New.

Appeal from Johnson Circuit Court.—*Hon. Ewing Cockrell,* Judge.

AFFIRMED.

*Thurman L. McCormick* and *W. E. Suddath* for appellants.

(1) The petition fails to allege unsoundness of mind or any facts of fraud, undue influence or coercion in support of which testimony could have been properly admitted. Smith v. Simms, 77 Mo. 274; McGindley v. Newton, 75 Mo. 115; Bliss Code Pleading, sec. 211; Sutherland v. Hood, 84 Mo. 297; Monroe v. Barclay, 17 Ohio St. 302; Sedway v. Land & Live Stock

Co., 163 Mo. 342; Lanitz v. King, 93 Mo. 513; Sec. 1254, R. S. 1919; State ex rel. Bristol v. Walbridge, 69 Mo. App. 657; Nichols Shepherd Co. v. Hubert, 150 Mo. 620. (2) The court erred in admitting incompetent, improper and highly prejudicial testimony on behalf of the plaintiffs over the objection and exception of the defendants. McFadin v. Catron, 120 Mo. 263; Schierbaum v. Schemme, 157 Mo. 1; Meir v. Buchter, 197 Mo. 92; Sunderland v. Hood, 84 Mo. 293; Von De Veld v. Judy, 143 Mo. 368; Sec. 5418, R. S. 1919; Holmes v. Anderson, 18 Barb. 420; Harper v. Railroad, 47 Mo. 567; Bank v. Murdock, 62 Mo. 70; Hamilton v. Crow, 175 Mo. 634. (3) The court erred in admitting the expert and hypothetical testimony offered on behalf of the plaintiff. Mayes v. Mayes, 235 S. W. 105; Wigginton v. Rule, 275 Mo. 412; Heinbach v. Heinbach, 274 Mo. 325; Deiner v. Sutermeister, 266 Mo. 521; Castanie v. Railroad, 249 Mo. 192; De Maet v. Storage Co., 231 Mo. 615; Glasgow v. Railroad, 191 Mo. 347; Roscoe v. Railroad, 202 Mo. 576; Crum v. Crum, 231 Mo. 638; Major v. Kidd, 261 Mo. 629; Couch v. Gentry, 113 Mo. 248; Hahn v. Hammerstein, 272 Mo. 248, 262; Schierbaum v. Schemme, 157 Mo. 22; Bailey v. Kansas City, 189 Mo. 503; Elsea v. Smith, 273 Mo. 409. (4) The court erred in overruling defendants' demurrer to the evidence. Riley v. Sherwood, 144 Mo. 364; Ferrel v. Brennan, 32 Mo. 328; Appleby v. Brock, 76 Mo. 314; Brinkman v. Rueggesick, 71 Mo. 553; McFadin v. Catron, 120 Mo. 252; Southworth v. Southworth, 173 Mo. 73. (5) The will was established by overwhelming evidence and there is no substantial evidence in the record to support the verdict and judgment of the trial court, which should therefore be reversed with directions to enter a judgment establishing the will. Turner v. Anderson, 260 Mo. 17; Story v. Story, 188 Mo. 128; Buswell on Insanity, secs. 189, 190; Richardson v. Smart, 65 Mo. App. 19; Creagh v. Blood, 2 Jones & La. T. 509; Southworth v. Southworth, 173 Mo. 72; Johnson's Will, 7 N. Y. Misc. 224; 1 Underwood on Wills, sec. 112; Wood v. Carpenter, 166 Mo. 486; Hahn v. Hammerstein, 272 Mo. 248; Von De

Veld v. Judy, 143 Mo. 348; Jones v. Jones, 260 S. W. 798; Frohman v. Lowenstein, 260 S. W. 465; Riley v. Sherwood, 144 Mo. 364; Silber v. Silber, 249 S. W. 394; Staples v. Wellington, 58 Mo. 459; Ralston v. Turpin, 25 Fed. 7; Richardson v. Smart, 152 Mo. 627; DeFoe v. DeFoe, 144 Mo. 458; McFadin v. Catron, 138 Mo. 137; Maddox v. Maddox, 114 Mo. 335; Doherty v. Gilmore, 136 Mo. 416; Schierbaum v. Schemme, 157 Mo. 1; Gibony v. Foster, 230 Mo. 106; Tibbe v. Kamp, 154 Mo. 545; Sehr v. Lindeman, 153 Mo. 276; Sayers v. Trustees, 192 Mo. 95; Archembault v. Blanchard, 198 Mo. 384; Hammond v. Hammond, 180 Mo. 707; Martin v. Bowdin, 158 Mo. 379; Cash v. Lust, 142 Mo. 630. (6) The court erred in giving the instructions asked on behalf of plaintiffs and further erred in refusing to give the instructions asked on behalf of defendants. Post v. Bailey, 254 S. W. 74; Wigginton v. Rule, 275 Mo. 451; Major v. Kidd, 261 Mo. 630; Southworth v. Southworth, 173 Mo. 73.

*Adolphus Musser* and *M. D. Aber* for respondents.

(1) The petition stated a cause of action. Sec. 526, R. S. 1919; State ex rel. v. McQuillen, 246 Mo. 674; Hendricks v. Callaway, 211 Mo. 536. (2) Even though petition not properly drawn, where question was not raised at trial that it was insufficient and no motion to make more specific presented, the appellate court will not determine that assignment. Meier v. Buchter, 197 Mo. 91; Ehrlich v. Mittelberg, 299 Mo. 300; Solomon v. Moberly L. & P. Co., 303 Mo. 634. (3) There was no error in admission of testimony. Heinbach v. Heinbach, 274 Mo. 301; 28 R. C. L. 402. (4) Even if question asked the experts be adjudged improper, proponents cannot now complain, for the objection made each time was in general terms, and not upon ground that it was either calling for a conclusion, or invading the province of the jury. Heinbach v. Heinbach, 274 Mo. 325; Dice v. Hamilton, 178 Mo. 90; Kinlen v. Railroad, 216 Mo. 172; Elsea v. Smith, 273 Mo. 396; State to use v. Diemer, 255 Mo.

336; Morton v. Lloyd Const. Co., 280 Mo. 380. (5) The
demurrer to evidence was properly ruled. Naylor v.
McRuer, 248 Mo. 423; Ray v. Walker, 240 S. W. 187;
Dunkeson v. Williams, 242 S. W. 652; Turner v. Ander-
son, 236 Mo. 544; Crum v. Crum, 231 Mo. 626; Roberts
v. Bartlett, 190 Mo. 680; Ehrlich v. Mittelberg, 299 Mo.
284; Wendling v. Bowden, 252 Mo. 647; Gott v. Dennis,
296 Mo. 66. (6) The instructions properly declared
the law. Holton v. Cochran, 208 Mo. 314; Major v. Kidd,
261 Mo. 628; Buford v. Gruber, 223 Mo. 253. (7) To
have testamentary capacity, a testator must have suffi-
cient understanding to comprehend the nature of the
transaction he is engaged in, the nature and extent of
his property, and to whom he desired to and was giving
it without the aid of any other person. Holton v. Coch-
ran, 208 Mo. 314; Riley v. Sherwood, 144 Mo. 354; Nay-
lor v. McRuer, 248 Mo. 423; Turner v. Anderson, 236
Mo. 523. (8) Although the admissions of Robert Kel-
ler may not be admissible as original evidence, they
are admissible as contradictions of his testimony at the
trial. Kuehn v. Ritter, 233 S. W. 7. (9) Proof as to
testamentary capacity at time of execution of instru-
ment is not limited to those present at that time. This
is the holding either in terms or inferentially in all the
decisions cited by proponents. Byrne v. Fulkerson, 254
Mo. 123.

HIGBEE, C.—This is an action to contest the will
of Alice Keller, resulting in a unanimous verdict for
the plaintiffs. The contestants, who are the children
of Joseph and Frank Keller, deceased, brothers of the
testatrix, Alice Keller, live in or near Baltimore, Mary-
land. The proponents of the will are two brothers, Robert
and Ishmael Keller, and the wife and children of Ish-
mael Keller, and William Walter Brady, the executor of
the will. The will provides:

"First: I desire my just debts to be paid.

"Second: I hereby give, devise and bequeath unto
my two brothers, to-wit, Robert Keller, of Harrisburg,

312 Mo. Sup.—30.

Pennsylvania, and Ishmael Keller, of Baltimore, Maryland, all the rest, residue and remainder of my property, of whatsoever kind or nature, real, personal or mixed and wheresoever situated to be divided between them share and share alike; and in the event of the death of Ishmael Keller his share is to be divided in equal shares among his children *subject to a dower right or charge in lieu of dower in his wife,* my intention being that he shall have the income from his share during his natural life, and at his death his share shall go to his wife and children as if he had died, seized and possessed of the same in fee simple.

"Third: I hereby nominate and appoint Wm. Walter Brady to be the executor of this my last will and testament. Dated this 22nd day of May 1921."

Signed, "Alice E. Kelar."

(The words italicized are interlined in the will).

The will was witnessed by J. P. Gilmer, Mary R. Gilmer and Mercer W. Gilmer. It was admitted to probate in Johnson County, Missouri, in June, 1921, and letters testamentary were issued to William Walter Brady, as executor, who duly qualified as such.

The petition, filed in the Circuit Court of Johnson County on December 15, 1921, for grounds of contest, alleges:

"Plaintiff avers that said paper writing is not, in truth and in fact, the will of said Alice Kellar, nor was it her will at the time of its pretended execution, nor was the same executed by her, if at all, while she was of sound mind and disposing memory, but if the same was ever executed by her at all, it was while she was of unsound mind, extremely ill and feeble in body and mind, and wholly incapable of making or executing a valid testamentary disposition of her property, and, if she did execute said instrument or sign her name thereto, the same was procured to be signed by her by fraud, deception, threats and undue influence of the defendants, or by and through their procurement and in their interest and behalf and through the influence and direction

of the will and direction of decedent's sister Marian Virginia Kellar, who had held the property hereinafter described as a joint tenant with decedent and who wholly dominated the mind of the decedent Alice Kellar, and who died a few hours before her, and at a time when said Alice was extremely ill, and in immediate expectation of death, and whose purpose and will it was that the paper writing mentioned should be to the effect which it would have had, if it had been in fact the will of the said Alice.''

The answer admits the relationship of the plaintiffs to Alice Keller as pleaded; admits the execution of the will and its probate; denies all other allegations and formally propounds the will.

The proponents made formal proof of the execution of the will and that the testatrix was of sound mind at the time of its execution.

The evidence for the contestants is very briefly summarized in respondents' statement, which, with a few unimportant changes, reads:

''The decedent was approximately seventy-five years old at time of her death. She had for about thirty years lived with her older sister, Miss Virginia Kellar, who had a few years previously come to Missouri from the region about Baltimore, and had by business acumen and skill accumulated some property in Kansas City, which under the advice of Mr. E. M. Metcalf of the Kansas City bar she had traded for a farm of about 460 acres, including some platted lots adjacent to the town of Kingsville in Johnson County. The decedent Alice had lived with her mother in Maryland until her death about 1892, after which time she had been with her sister Virginia at and about Kansas City until the acquisition of the Kingsville farm. After that she lived with her on the farm or in Kingsville in a house owned by Virginia. On June 11, 1915, Miss Virginia Kellar, using a third party as a conduit, conveyed the land so as to create a joint tenancy in the land with herself and her sister Alice as joint tenants. Notwithstanding this, she continued to manage the farm, made leases, collected

rent and handled all of the business herself. Miss Alice Kellar during all of this time did no business for herself, stayed at home, attending to domestic duties under her older sister's direction and when out or about, followed her sister. Alice stated during that time that she 'couldn't attend to a bit of business.' That all business transactions of any kind were looked after solely by Virginia. That in the midst of such transactions, Alice 'didn't hardly realize what was going on there any of the time.'

"In April, 1921, the sisters went to Kansas City and took a room in the home of Miss Gilmer, at 4032 Main Street. They were accompanied by their youngest brother, Robert, one of the defendants, a resident of Pennsylvania, a man at that time about fifty-two years old. He had been married about four years before, but was concealing the fact from his sisters, due to their antipathy to matrimony. His intellectual limitations are somewhat indicated by his reported cross-examination.

"Robert became ill early in May. After his recovery, Virginia got sick, followed in two or three days by Alice. They occupied the same bed. Proponents' testimony as to the connection of these women with Christian Science varies. Miss Gilmer and her brother Mercer W., who did not adhere, testify positively that the sisters were Christian Scientists. Mrs. Lane, their long-time intimate, and herself an active Christian Scientist, testifies positively that they were not. On May 10th, Virginia had Dr. Songer, a regular practicing physician, called. He attended them then until Virginia's death, his last visit being at 10:30 P. M. of Friday (May 20th). At that time 'when you spoke to her, she would answer you rationally for a minute, then complain of pain and talk irrationally.' In his opinion, she was not rational or mentally sound when he last saw her, and had not been for some time. Virginia died early Saturday morning, some two hours after Dr. Songer left. Sometime between his departure and her death, Alice was lifted from the common bed and placed in one in another room.

"About eight o'clock Sunday morning, May 22nd, M. W. Gilmer called Dr. Scott P. Child to attend Alice. Dr. Child qualified as an experienced, expert physician. He reached her bed-side about 8.15 A. M. She was then, he testified, half dressed, reclining on the bed, very seriously ill, restless, unable to talk, extremely high fever, with rapid pulse, and 'in a very desperate physical condition.' 'She was evidently irrational.' He ordered her taken to the hospital 'because her condition was such, both physically and mentally, that she was incapable of taking care of herself or being taken care of without a nurse or being taken to the hospital.' Dr. Child was there about twenty or thirty minutes. Her temperature was 101 and pulse around a hundred, and progressive. Asked whether or not in his opinion at that time she was in 'that condition of mind that she could have a knowledge of the extent, nature and value of her property, of the persons who would be the natural objects of her bounty and be able to hold them on her mind for a sufficient length of time to direct disposition of them' he answered that 'she was not rational and the examination of her lungs with the state of her mind indicated that she was dying.' He observed her at the house from twenty to thirty minutes, and after her arrival at the hospital, which was at 10 A. M., about an hour. 'During the period of time I observed her she was irrational and she was dying.' On cross-examination Dr. Child was pressed to say that he could not know the patient's condition after he left her, between 8:30 and nine o'clock and her arrival at the hospital at ten, during which period the will was written. He answered that he could know; the question was then asked whether he could know *by observation*, and he answered that he could not know *by observation*, but that he knew pathologically. On re-direct examination he said in his experience from the conditions he saw her first and as he saw her at the hospital her mental condition had remained unchanged. The irrational condition was such as the Doctor from

his experience would expect to find in similar cases. She died on Sunday, May 21, at 2:30 P. M.

"The copies made by Dr. Child from the permanent records of St. Luke's Hospital, as made by him, being rejected, Miss Grace Cox, head nurse of the hospital, was brought with the original records made in the handwriting of Dr. Child and the witness, and were all identified by her as the permanent records of the hospital regarding this case. The records verify Dr. Child's testimony, that the patient was irrational.

"Miss Cox, an experienced, graduate nurse, further testified that she had Miss Kellar in charge as a nurse during the entire time she was at the hospital and that she was irrational when she entered and so remained the entire time. 'She was irrational all the time.' 'She talked a little, irrational, wild-like and tried to get out of bed.' "

The testimony of Dr. Child may be stated a little more in detail: She (Alice Keller) had a condition that we call pulmonary edema, in which there was a bubbling noise throughout both chests, indicating a very grave condition, and you determine that with your ears, or with a stethoscope. Her breathing was very rapid and irregular; her pulse around a hundred and it was progressive . . . I next saw her at the hospital, between 10:30 and noon, at which time I went home . . . I observed her at the house for a period of between twenty minutes and half an hour and then afterwards saw her for a period of about an hour at the hospital and then I went to the office and during that time she died. During the period of time I observed her she was irrational and she was dying. Cross-examination: She had lobar pneumonia of the left side; she had pulmonary edema at the time I was called in; she was dying . . . Lobar pneumonia is an inflamation or disease of the lungs in which organisms or germs develop like seeds growing in the ground and the whole lung was solid. An autopsy was held on the patient; it was this poisonous material filling up the whole of the left lung

caused her fever and irregular pulse, and it finally went on to the point where the condition which I found which we call pulmonary edema, which is a late process usually indicating death, and that was the condition, and with my findings at that time her irrational condition was quite what I would expect from our experience with many other cases. "Q. The irrational condition you speak of, what would you say, was it the temperature that caused that or was it a different—A. No, the mental condition and temperature were due to the same poison or *toxaemia*."

Dr. Songer testified that he treated Virginia Keller from May 10th to her death, May 20th or 21st. Virginia and Alice were both sick and in the same bed; Virginia tried to get Alice to let him treat her, but she refused to take the medicine; there seem to be a lung involvment; she (Alice) was coughing and running temperature and delirious at times. She gradually grew worse and weaker and more delirious. Cross-examination: From May 10th to 20th, I made six calls. I examined Miss Alice Keller the first time I saw her; Miss Virginia insisted that I treat her sister. I examined her lungs and temperature and her ear. She was suffering from an abcess in her ear. She seemed to have fever all the time, the outward symptoms showed she was as sick or sicker than her sister. As I say, when you spoke to her she spoke rationally for a few seconds, then when you let her alone she would begin to mutter and mumble and complain of pain. Sometimes she made statements, sentences were disconnected, muttered and mumbled; sometimes you could understand what she said and sometimes you couldn't; like a person in delirium. The last time I saw her was on May 20th about 10:30 or 11 at night.

The testimony for the proponents was that Virginia and Alice Keller had lived in Missouri nearly all their mature years and by their frugality and industry had acquired the farm of 460 acres and other property; that the real estate was held in joint tenancy; that they had

not kept in touch with their nephews and neices, either by correspondence or otherwise; there had been no correspondence for eight or nine years; that Virginia always said she wanted Alice to have the property as long as she lived, and when she was gone the boys could have it.

Mrs. Ed. King, their neighbor, testified: Miss Alice said, "I love my brothers and I want my brothers to have it when I am gone; my brothers that are living, but their families I care nothing for, because the daughters-in-law have not been nice to my mother." She said that a short time before she went up to Kansas City, and she said it at various times.

For some time prior to their deaths, Virginia and Alice felt the need of some one to care for them, and in response to a telegram Robert came from his home in Pennsylvania and lived with his sisters from March 8, 1921, until they died. In December the two sisters went to the office of William Walter Brady, a lawyer in Kansas City, and gave instructions for the preparation of their wills. Alice instructed Mr. Brady that she wanted to divide her property between her brothers Robert and Ishmael. It was agreed the sisters would return at a later date and execute the will, but the wills were not written or executed.

As previously stated, Robert and his sisters went to Kansas City about April 21st and secured rooms in a house occupied by Mercer W. Gilmer and his sister, Mary Gilmer. The Gilmers saw and conversed with Alice Keller every day and they and other witnesses, who frequently saw her, agree that while she was a very sick woman for some time before and at the time she signed the will, she was at all times rational and there was never any indication of delirium. On Sunday morning, Mercer Gilmer called his brother, J. P. Gilmer, and Mr. Brady, both members of the Kansas City bar, and Dr. Child. A few minutes after Dr. Child left the house the three Gilmers and Mr. Brady went into Miss Alice's room. Mr. Brady testified, as summarized in appellants' statement: "I greeted her and talked with her, just

casual conversation as one would upon entry into a sick room, and then I broached the subject with reference to the will proposition. I found her, talked with her long enough to satisfy ourselves that she was in condition of mind to make a will, and asked her what she wanted and had her say again how she wanted her property divided, and took memoranda, wrote it down with pencil and paper, and after that was done Mr. J. P. Gilmer and I went down stairs and out on the front porch where we would not be disturbed and there I wrote the will. Its condition there is due to the fact that I wrote it on a little book on my knee like this (indicating) on the porch. At the time we were receiving the memorandum from Alice with respect to the disposition she desired to make of her property, J. P. Gilmer, Mercer Gilmer and Miss Mary Gilmer and Mrs. King were in the room, and at times I saw Mrs. Lane's face at the door; after the will was drawn we all returned to the room, then I went over the will as written, and let me say that when that will was prepared down stairs, if you will note down there where the executor is named at the end of the line, I left that space blank, because that question had not been asked her when we took the memorandum. I left the space blank, the third line from the bottom, 'I hereby appoint Wm. Walter Brady;' that name was not in it when I went upstairs; I left that blank. Neither was the interlineation 'subject to dower right or share in lieu of dower in his wife.' Those two things were not in there when we went upstairs. We went over again with it to Miss Alice and read it slow and explained it to her as we went along, and when I got through Mr. Gilmer referred to the fact that she wanted to confine Ishmael's share to his family, so that he could not dissipate it, and Mr. Gilmer suggested himself these words and I accepted his suggestion and with my own hand put those lines in there. I then asked her who do you want to name to carry out your wishes in this matter and she turned to me and said, 'Why, you of course.' Then the name was written in there, my name as exec-

utor; then we proceeded to the execution of the will; Mr. Gilmer's suggestion 'subject to dower rights, etc.,' was made to her and to me and she replied that was the way she wanted it. Then the will in the form it now stands was laid before her and she signed it; she was re-' clining on her left side and I put my arm around her to conserve her strength and brought her up to a reclining position and laid the book on the bed and paper on the book and gave her the pen and she signed her name. I then said to her, 'Now, Miss Keller, you will have to have witnesses to it, and do you wish these folks here, the Gilmers, the two brothers and the sister Mary, to sign as witnesses,' and she said, 'Yes,' and then the paper was then and there signed by two Gilmer brothers and Miss Mary Gilmer; at the time she signed the will her mind was absolutely normal; she was weaker of course physically, but her mind was absolutely bright, there was not one word to indicate anything else, neither was she irrational or delirious; she responded promptly to any question that was asked her and gave an intelligent reply. The difficulty was that one of her ears was rather stopped up and we had to talk, I would not say quite loud, but I would say rather loud to her in order to get her to hear. During the giving of the instructions for the drawing of the will, mention was made of the heirs of the deceased brothers and the number of them, which she indicated was six; six in the family; there were two families of the two deceased brothers; she called some of their names; do not know which ones she called by name, but she called three or four by name.''

The testimony for the proponents is that Alice Keller gave the directions for making the will in a clear and positive manner; that her mind was clear and that she understood the will thoroughly at the time it was executed. A number of witnesses testified as to her prior statements, that she expected to dispose of her property to her brothers Robert and Ishmael. The ambulance was waiting at the door and as soon as the will was exe-

cuted, Miss Keller was carried from her bed, placed in it and taken to the hospital at ten A. M.·

The court gave the following instructions for the proponents:

"1.   The court instructs the jury that there is no evidence in this case of fraud, deception, threats or undue influence and the issues  of fraud, deception, threats and undue influence are withdrawn from the consideration of the jury.   And the jury are further instructed that the only issue in this case is whether or not the said Alice E. Kellar had sufficient mental capacity to execute a will as defined in other instructions herein.

"2.   The court instructs the jury that the kind of mental unsoundness which renders a person incompetent to make a will does not mean mere imperfection of memory caused by sickness, or a mere lessening of the ordinary powers of the mind, or wandering of the mind or other diseases or nervousness, or even failure to be able to transact ordinary business at times or habitually.

"A person may give all these manifestations or suffer from all these afflictions·or any of them, or even be. temporarily insane or suffer from delusions or be temporarily irrational or delirious; yet he possesses capacity to make a will and dispose of his property by will, if at the very time he makes his will he understands that he is making a will and is able to remember the natural objects of his bounty and the manner in which he desires to dispose of his property and generally understands the nature and character of his estate.

"3.   The court instructs the jury that the issue in this case is whether or not the document produced and read in evidence as the Last Will and Testament of Alice Kellar, deceased, is the last will and testament of said Alice Kellar.

"Under the law of this State every person of the age of twenty-one years or· more may dispose of all of her estate by will in such manner as she may see fit and proper, provided she is, at the time she makes the will, of sound mind, and provided the will is in writing and

is signed by her and attested by two or more competent witnesses subscribing their names thereto in her presence.

"If, therefore, the jury believe from the evidence that the writing produced and read in evidence was formally executed by Alice Kellar according to the above requirements of the law, and that two subscribing witnesses thereto have testified to the sanity of said Alice Kellar, and that she was of proper age to make a will, then the court instructs you to find in favor of the will, unless you further find from the evidence in the case that said Alice Kellar at the time of the execution of said will had not sufficient mental capacity to make a will, as defined to you by the court in other instructions.

"4.   The court instructs the jury that the only question for your consideration in this case is whether or not Alice Kellar was of sound mind at the time she executed the paper writing offered in evidence, purporting to be her last will and testament.  You are to consider this question and this only.

"The state of deceased Alice Kellar's mind, before and after the execution of the will, is material only as it tends to throw light on the condition of her mind at the time of the execution of said paper.  It is important only as it may aid you in making your inquiry as to her mental condition at that time.

"If you find that she had mental capacity to make the will, as such capacity is defined in other instructions, then it is your duty to uphold the will regardless of other facts and circumstances in the case.

"5.   The court instructs the jury that a person owning property has a right to dispose of it by the will as she sees fit.  The purpose and policy of the law is to permit those who possess property to dispose of it and to dispose of it unequally, if they so desire.

"The jury are therefore instructed that the decedent, Alice Kellar, if of sufficient mental capacity as defined in other instructions, had the right to make the will in question, and dispose of her property as she did

dispose of it, and the jury have no right to set aside the will on the sole ground that there was an unequal disposition of the property under the will, if you believe there was, and even though it was not such a will as the jury themselves might have made.

"6. The court instructs the jury that it requires no greater mental capacity to make a valid will than to transact ordinary business, and the owner of property who is of sound mind, that is, who has the mental ability to know and comprehend that he is disposing of his property by will, the general value and character of the property, the natural objects of his bounty and to whom the same is being given, has a lawful right to dispose of his property by will as he sees fit and proper.

"(a) The court further instructs the jury that neither old age, sickness, feebleness, bodily infirmity, or weakness of the mind incapacitates the making of a will.

"If, therefore, the jury believe from the evidence in this case that Alice Kellar executed the paper writing dated the 22nd day of May, 1921, and read in evidence as the will of Alice Kellar, in the form and manner above prescribed, and at the time she executed said instrument, if the jury find and believe she did execute the same, she had sufficient mind and memory to know that she was disposing of her property by will, to whom she was giving it, and the nature, character and general value of her property, then she was of sound mind and memory, and you will find said paper writing to be her will, even though you believe from the evidence that she was weak, sick, infirm, and feeble and nigh unto death at the time she signed it and for these and other causes her mind was not as vigorous as it had once been and her body was weak and feeble.

"7. The court instructs the jury that the opinions of parties who testified as experts are merely advisory and not binding on the jury, and the jury should accord to them such weight as they believe, from all the facts and circumstances in evidence, the same are entitled to receive."

The court gave the following instructions for the plaintiffs:

"A. Gentlemen of the jury, the issue submitted to you in this proceeding is this:

"Is the paper writing here produced and offered in evidence before you the will of Alice Kellar deceased? If under the instructions given, you find from the evidence that said paper writing here produced, is the will of Alice Kellar, you will return your verdict in this form:

" 'We, the jury, find that the paper writing produced and read in evidence is the will of Alice Kellar, deceased.'

"If under the instructions given you find from the evidence that said paper writing here produced is not the will of the said Alice Kellar, deceased, then you will return your verdict in this form:

" 'We, the jury, find that the paper writing produced and read in evidence is not the will of Alice Kellar, deceased.'

"B. The court instructs the jury that in determining the issue of sufficient soundness of mind or testamentary capacity, possessed by the testator, to make a will, you are instructed that if a person has not mind and memory enough to understand the ordinary affairs of life, the value, extent and nature of his property, the number and names of the persons who are the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessity, and has not active memory enough to retain all these facts in his mind long enough to have his will prepared, he has no power to dispose of his property by will.

"C. The burden rests upon the defendant to prove by the greater weight of all the credible evidence, that Alice Kellar, at the time of signing the paper writing in question, possessed a sound and disposing mind and memory, as defined in other instructions.

"D. By the expression used in these instructions, 'preponderance or greater weight of the evidence,' is not meant the mere number of the witnesses who have

testified for or against a given question of fact in issue
before you. Such expression means that after you have
fully and carefully considered all the evidence in the case,
you should decide the question of fact in favor of the
party with whom you find the proof of such fact to have
the most convincing effect upon your minds.

"E.   In determining the issue of sufficient soundness
of mind or testamentary capacity possessed by the tes-
tatrix, to make a valid will, the will itself and all its pro-
visions may be considered by the jury in connection with
all the other facts and circumstances given in evidence.

"F.   The court instructs the jury that while the
question of whether or not the paper writing read in ev-
idence is or is not the last will of Alice Kellar is depend-
ent so far as the question of her mental capacity or in-
capacity is concerned, upon the possession by her of
testamentary capacity as defined in other instructions,
at the time she signed such paper, yet in determining the
condition of her mind at that time, you may consider
her condition, both before and after such time and the
nearness or remoteness of such conditions, if you so find,
as shedding light upon her possession of such testamen-
tary capacity at the time she signed the said paper
writing."

Instruction G is on the weight of the evidence and
the credibility of the witnesses.

I.   The first assignment of error is that the peti-
tion fails to state facts sufficient to constitute a cause
of action; that the petition fails to allege un-
soundness of mind or any facts of fraud, un-
due influence or coercion in support of which testimony
could have been properly admitted.

Pleading.

The issues of fraud, coercion and undue influence
were withdrawn from the consideration of the jury;
hence they are out of the case, and the sufficiency of the
averments as to unsoundness of mind is the only one
with which we are concerned. The portion of the peti-
tion attacked is set out in the statement of the case.

The sufficiency of the petition was not challenged in the trial court by demurrer, motion or otherwise. In appellants' statement learned counsel say: ''The validity of the will is assailed on the ground of the want of testamentary capacity at the time of the making of said will, together with fraud.'' The case was tried on the theory that the petition charged that the testatrix was of unsound mind at the time the will was alleged to have been executed. The proponents introduced evidence tending to prove that she executed it and that she was of sound and disposing mind and memory at the time and that it had long been her settled purpose to dispose of her property to her two surviving brothers. On the other hand, contestants, without objection, offered evidence tending to prove that at the time of its alleged execution, the testatrix was not only of unsound mind, but that she was in *articulo mortis*. While the petition in this respect may be inartificially drawn and may not be commended as a precedent of good pleading, yet we think it substantially tenders the issue of lack of testamentary capacity and that after verdict it must be held good. Even if the averments were technically insufficient to raise the issue, we hold, as was held in Solomon v. Moberly L. & P. Co., 303 Mo. 634, 262 S. W. 367, and cases there cited, that as respondents would have been entitled in the trial court to amend the petition to correspond to the facts proven, we will treat the petition here as having been properly amended.

II. It is contended that the court erred in admitting incompetent, immaterial and highly prejudicial evidence. The evidence complained of is that of a number of the neighbors and acquaintances who testified to the effect that Alice Keller was a woman of feeble intellect; that Virginia transacted all the business while Alice, under the supervision of her sister, did the housework and errands assigned to her by Virginia. This evidence was admissible as bearing on Alice's mental capacity.

Evidence.

There was also evidence that Virginia, in the presence of Alice, consulted Mr. Metcalf, an attorney in Kansas City. Mr. Metcalf, who, at the time referred to in his testimony, was associated with Mr. Brady in the practice of the law, testified: The title was taken to Miss

<span style="margin">Owner's Reasons for Conveyance.</span>
Virginia Keller and she was very solicitous about the future of Alice in the event she (Virginia) died, because she said Alice was not capable of taking care of herself or the property and for that reason she wanted to know if there wasn't some way to protect her, so in the event of her death Alice would be protected, and I suggested— Mr. McCormick objected to what Virginia Keller said as to the condition of Miss Alice or her opinions. The objection was overruled, because Alice was present and heard the conversation. The witness further stated that in this conversation Virginia asked if she could protect Alice by a will; that she had a number of relatives in the East and she did not want them to have any interest in it until Miss Alice died, because she and Alice had lived together for years; that she wanted it to go to Alice so that Alice might have a livelihood, but Alice— this was in the presence of Alice—couldn't take care of it, would lose it, did not know anything about business and therefore she must make some arrangements so as to be assured Alice would be protected. This was soon after Virginia got the farm in 1911. Witness suggested a conveyance of the title to both of them in joint tenancy, but that, he said, would not remove the possibility of Alice getting it and losing it; so Virginia concluded to have a will drawn with a trustee. Thereafter deeds were drawn creating a joint tenancy.

After this and much other like testimony had been given by the witness, counsel moved to strike out his evidence, because it was irrelevant, immaterial, not tending to prove any issue, and because Met-
<span style="margin">Privilege.</span> calf was acting in a professional capacity and it is privileged. The motion was overruled.

312 Mo. Sup.—31.

The evidence fails to show that the relation of attorney and client existed between the witness and Alice Keller. But, waiving that question, appellants should have made their objection on the score of privilege at the first opportunity, otherwise it was not timely and they waived the privilege. [State v. Powell, 217 S. W. 35 (3).] "The proper time for objection is when a question calling for a disclosure of privileged matter is asked and before it is answered." [40 Cyc. 2395.] The evidence was clearly relevant on the question of the mental capacity of the testatrix.

Robert Keller, one of the defendants, testified that after the death of his sister he went to Baltimore and at the request of Mr. Brady, the executor, inquired of some of the plaintiffs the names of the children of his deceased brothers, Joseph and Frank. He testified that his brother Ishmael had been absent from his family for some years and he inquired if any of the plaintiffs had heard from him or knew where he was. On cross-examination he was asked if he had made certain statements regarding the circumstances of the execution of the will and the state of Alice's mental condition, to certain of the contestants whose depositions in this cause were then on file. He denied all the alleged statements. The court had previously excluded the depositions of the witnesses as to these statements on the ground that they were not binding on the other proponents of the will, Ishmael Keller, his wife and children. [See Gott v. Dennis, 296 Mo. 93, 246 S. W. 218, and cases cited.] The depositions were offered in contradiction of the testimony of Robert Keller and portions of them were admitted solely for that purpose. Counsel for proponents objected to the reading of the depositions. Mr. McCormick: They could only be offered for the purpose of contradicting the witness who testified on this stand with respect to these matters that he gave in his testimony; for the further reason they are not proper at this time for the purpose of indicating the truth or falsity of the statements. The ob-

*Contradiction of Witness.*

jection was overruled and an exception noted. The following is the portion of the deposition of Joshua Keller, one of the plaintiffs, which was read in evidence. It will suffice to show the character of the evidence admitted over the objection of the proponents:

"Q. 9. I am directing your attention to conversation in regard to a will being made after Virginia's death? A. I said to him, 'Is this worth monkeying with?' He said, 'There will be a few hundred in it.' I said to him, 'Did they make a will?' He said, 'Yes, a will was drawn,' but he didn't think she was capable of making a will because the lawyer told him that anybody could walk in on the will that was made then, and he said another one was made.

"Q. 12. What did he tell you about her condition at the time this will was made? A. He said they were childish and feeble-minded, the way he brought it out; he said they did not know very much of what they were doing, that was the way he brought it out.

"Q. 14. What did he say at the time of the making of the will—what did he say to her at the time the will was made about the ambulance? A. He told me they were childish.

"Q. 15. Told whether they were sick or well— at the time of the will? A. She was sick in bed and the ambulance was waiting outside to take her to the hospital.

"Q. 16. What did he say about how long she lived after she was taken to the hospital? A. Two hours after she was taken to the hospital.

"Q. 17. What, if anything, did he say there at the time about what Mrs. King had said about their condition? A. He said the girls had been acting childish for the last three years.

"Q. 19. What did they say about how they treated him? A. They treated him awful. Seemed to grudge the least little bit of food that he wanted and he could not stand it.

"Q. 20. He said they treated him awful; did he give any other details? A. He said they did not give him enough to eat."

The deposition referred to a conversation alleged to have occurred between the deponent and Robert Keller, who, on the witness stand, had categorically denied making the several statements to the witness. Counsel in their brief contend the statements of Robert Keller to the deponent were inadmissible and cite McFadin v. Catron, 120 Mo. 252, 263, where the plaintiff was permitted, on cross-examination of defendants' witness Terhune, to inquire "as to the expressions of the opinions of the witnesses as to the provisions of the will, that it might be broken." It was held that the opinions of the witnesses had no bearing whatever upon the issues involved and should have been excluded. There is no analogy between the cases. It is not contended here that the statements of the defendant Robert Keller were not material or relevant. The court, when admitting this testimony, told the jury it was "offered solely for the purpose of contradicting the defendant Robert Keller, and is not for the jury to consider the truth or falsity of the statements in such alleged contradiction." The objection was properly overruled.

III. The next assignment of error is the admission of expert and hypothetical testimony offered by the plaintiffs.

Dr. Child was asked if, in his opinion, at the time he saw the testatrix at the Gilmer house, she was capable of having a clear and accurate knowledge of her property, its value, nature and extent, etc. On objection there was some argument of counsel and the question was reframed and modified as follows: "Q. State whether or not a person in the condition you found this lady in at that time would be able to have in mind, whether she was able at that time, this woman in that condition of mind, would have and could have a knowledge of the extent, nature and value of her property, all her property, of the per-

Invasion of Province of Jury.

sons who would be the natural objects of her bounty and be able to hold them in her mind for a sufficient length of time to direct disposition of them?"

Counsel renewed their objection which was overruled, but an exception was not saved. In answer to this question, Dr. Child testified as heretofore set out that the testatrix was irrational and was dying. A motion to strike the answer as irresponsive was overruled, but no exception was saved.

The contention is that the court "permitted the witness to invade the province of the jury and to substitute his views and opinion as to her ability to have a clear and accurate knowledge of her property, its value, nature and extent, etc., instead of leaving this question to be determined by the jury." Learned counsel overlooked the fact that the question of which they are complaining was not answered and no exception was saved to the question that was subsequently asked. They do not question the competency of the witness to give an opinion as to the sanity of the testatrix. They cite cases holding that it is not competent for a witness to state his conclusions as to the ultimate fact to be found by the jury. [See Heinbach v. Heinbach, 274 Mo. 310 (8), 202 S. W. 1123; Mayes v. Mayes, 235 S. W. 100, 105; Post v. Bailey, 254 S. W. 74.] Similar rulings were made as to expert witnesses in Castanie v. Railroad, 249 Mo. 192, 155 S. W. 38, and other cases.

Referring to the time he last saw the testatrix, substantially the same question was propounded to Dr. Songer as that heretofore set out and in answer to which Dr. Child had replied that the testatrix was irrational. Objection was made: "Mr. McCormick: Objected to for the reason it sets an improper, false and illegal standard upon which to base or judge the rationality of a devisor and for the reason it is highly improper, incompetent and should be excluded." The answer was: "She didn't have that ability." The objection was overruled and an exception noted. We think the question indicates the proper standard of testamentary capacity. It is

substantially the standard required by appellants' instruction numbered 6. The objection that "it is highly improper, incompetent and should be excluded" is too general. It was not objected that it was an invasion of the province of the jury. Almost this identical objection was held insufficient to authorize a review of the alleged error in Heinbach v. Heinbach, supra, 215, 325. The ruling in the cases cited relative to the contention that the opinion of the expert witness invades the province of the jury has been modified.

In O'Leary v. Scullin Steel Co., 303 Mo. 377, 260 S. W. 59, the court en banc quoted approvingly from Wood v. Railway, 181 Mo. l. c. 450, 81 S. W. 157: "The mere fact that the opinion called for covers the very issue which the jury will have to pass upon is not conclusive that it is not the proper subject of expert or opinion evidence. For example, sanity or insanity is the subject of expert testimony, although that may be the sole issue to be determined by the jury. Neither do we appreciate the fine distinction sometimes sought to be drawn between asking the expert whether, in his opinion, certain causes might produce certain results, and asking him whether, in his opinion, they did produce certain results."

It was competent to ask Dr. Songer if, from his knowledge of the condition of his patient, she was, in his opinion, sane or insane. This must be conceded. The question propounded to Dr. Songer was in substance the same as if he had been asked if the testatrix were of sound mind, and, according to the ruling in the O'Leary case, there was no error in permitting it to be answered.

Dr. W. G. Thompson, a qualified medical expert, was asked: "What would you say as to the capacity of a patient to know and realize the value and nature and extent of the property had by such a person, the name and number of the natural objects of the patient, that is the heirs at law, their disposition with reference to their treatment of the person so afflicted, if taken at a time when such person is seventy years or upward and is

found in a condition of lobar pneumonia, highly toxic, with pulse in the neighborhood of 100, rapidly rising, and very short of breath, and one who dies within six or seven hours of the time in question and in which the autopsy shows that a lung is filled and is full of poisons developed from the condition of pneumonia?'' Objection was made that the hypothetical question was based on matter not in evidence. THE COURT: ''The court will permit, based upon his recollection and his notes on the testimony, the court will permit the hypothetical question asked by Mr. Aber in the form last indicated, based upon the patient being in the following condition, that eight o'clock, about eight-fifteen one morning she had lobar pneumonia followed by pulmonary edema with a temperature of 101, which remained, and a temperature of 101, also later in the day. . . . And the autopsy showed the left lung entirely filled, toxaemia comes from that. If that is sufficient for you the court will permit that. Now, Doctor, what do you say as to her capacity, actual or probable under those conditions, as to her capacity between eight-fifteen and about ten o'clock that same morning? A. I would say that the probabilities were that a patient in that condition is irrational and not in a position to transact business, that would be my opinion.''

No objection was made to the question as modified by the court until after it was answered. It appears to have properly hypothesized the facts as shown by the evidence of the plaintiffs.

IV. It is contended that the evidence is uncontradicted that at the very time the will was executed, the testatrix was of sound and disposing mind and memory, and that the court should have directed a verdict for the proponents.

Directed Verdict.

The testimony of the expert witnesses is that the testatrix was delirious on Friday night before the will was signed. Dr. Child saw her within half an hour before the execution of the will and within an hour thereafter. He testified that when he saw her at the house

she was suffering from pulmonary edema; that it in-
dicated death; that during all the time he saw her she
was irrational and dying; that he did not see her at
the time the will was executed, but that he knew her con-
dition then, not by observation, but pathologically; that
her malady was progressive; that it caused her death
a few hours after the execution of the will, and that in
his opinion she was irrational and dying at that time.
His diagnosis is not questioned, and is confirmed by
the post-mortem and the hospital records.   There was
much evidence that, while in good health, the testatrix
was feeble-minded and unable to transact business or
to protect her interests.   In Dunkeson v. Williams, 242
S. W. 657, we quoted from Buford v. Gruber, 223 Mo. 231,
253, 122 S. W. 722:

   " 'Where a charge of insanity is made against a
testator, evidence is competent to show the condition of
his mind long prior to and closely approaching the time
of the execution of the will, as well as the condition of his
mind shortly subsequent to its execution. The purpose of
such testimony is to indicate the state of his mind at the
very time of the execution of the will.   The condition of
his mind is tried as of that time.   All such evidence is
receivable for the purpose of indicating to the jury
whether or not the testator at the time the will was ex-
ecuted had sufficient mental capacity to fill the require-
ments of the law. [Von De Veld v. Judy, 143 Mo. l. c. 363;
Knapp v. Trust Co., 199 Mo. 640; Holton v. Cochran,
208 Mo. l. c. 426.]' "

   This accords with appellants' instruction numbered
4.

   V.   Appellants contend that there was no evidence
tending to contradict the formal execution of the will
and that the court erred in giving Instruction A, sub-
mitting that issue, to the jury.   Appellants cannot com-
plain of this instruction; they submitted the
same issue in their instruction numbered 3.
Other instructions for appellants and re-
spondents distinctly told the jury that the only issue

Formal
Execution.

submitted for their consideration was the question as to whether or not the testatrix had sufficient mental capacity to execute a will, as defined in other instructions. The jury could not have misunderstood the issue.

VI.   Appellants complain of Instruction B, given for respondents.   This instruction was approved in Crum v. Crum, 231 Mo. 626, 638, 132 S. W. 1070; Byrne v. Fulkerson, 254 Mo. 97, 120, 162 S. W. 171, and Ray v. Walker, 293 Mo. 447, 466, 240 S. W. 187.

<span style="margin">Test of Capacity.</span>

Appellants complain of the refusal of their instruction numbered 10, that on making formal proof of the execution of the will they made a prima-facie case and the burden then shifted to the plaintiffs and that it devolved upon them to overcome the prima-facie showing by substantial evidence, otherwise the verdict should be in favor of the will.   There was no error in the refusal of this instruction.   The burden is not met by making out a prima-facie case, but remains upon proponents throughout the trial.   [Major v. Kidd, 261 Mo. 607 (7), 170 S. W. 879; Mayes v. Mayes, 235 S. W. 100 (4).]

<span style="margin">Burden.</span>

Appellants complain of the refusal of other instructions.   The case was submitted to the jury upon instructions fully covering all the issues.   Instructions 11 and 12, which were refused, were fully covered by Instruction 7.   The second paragraph of Instruction 6, which we have marked "(a)" and which is repeated in the latter part of the instruction, is erroneous as minimizing, if not wholly destroying, the effect of contestants' evidence, though a correct statement of an abstract rule of law."   [Post v. Bailey, 254 S. W. 71 (3).]   It should not have been given.

<span style="margin">Feebleness.</span>

VII.   Error is assigned as to improper remarks by respondents' counsel in their argument to the jury. The trial of the case extended over a period of three

days. Some feeling and friction were engendered dur-
<span style="margin">Argument to Jury.</span> ing the trial, but we see nothing in the remarks that can fairly be considered as prejudicial to the proponents and will not extend this already too lengthy opinion by setting them out.

The case was well tried, and the judgment is affirmed. *Railey, C.,* not sitting.

. PER CURIAM:—The foregoing opinion of HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.